## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**ACTS 17 APOLOGETICS**; **DR. NABEEL QURESHI**; **DAVID WOOD**; **PAUL REZKALLA**; **NEGEEN MAYEL**; and **JOSHUA HOGG**,

        Plaintiffs,

    v.

**CITY OF DEARBORN**; **JOHN B. O'REILLY**, Mayor, City of Dearborn; **RONALD HADDAD**, Chief of Police, City of Dearborn Police Department; **JEFFREY MROWKA**, Police Officer, City of Dearborn Police Department; **BRIAN KAPANOWSKI**, Police Officer, City of Dearborn Police Department; **JUSTIN SMITH**, Police Officer, City of Dearborn Police Department; **ANDREW BALLARD**, Police Officer, City of Dearborn Police Department; **JAROD MICALLEF**, Police Officer, City of Dearborn Police Department; **MARK MATTEOCCI**, Police Officer, City of Dearborn Police Department; **A. FAWAZ**, Police Officer, City of Dearborn Police Department; **R. GAFFORD**, Police Officer, City of Dearborn Police Department; **JOHN DOE POLICE OFFICERS 1** through **9**, fictitious names, Police Officers, City of Dearborn Police Department; **FAY BEYDOUN**, Executive Director, American Arab Chamber of Commerce; and **NORMA HAIDOUS**, Special Events Coordinator and Executive Assistant, American Arab Chamber of Commerce,

        Defendants.

**COMPLAINT**
[Civil Rights Action under 42 U.S.C. § 1983 & Michigan State Law]

Demand for Jury Trial

---

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500

---

1

Plaintiffs Acts 17 Apologetics, Dr. Nabeel Qureshi, David Wood, Paul Rezkalla, Negeen Mayel, and Joshua Hogg (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, bring this civil rights Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This case seeks to protect and vindicate fundamental constitutional rights.  It is a civil rights action brought under the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Michigan state law, challenging Defendants' acts, policies, practices, customs, and/or procedures that deprived Plaintiffs of the right to engage in Christian religious speech and expressive activities in the City of Dearborn (hereinafter "City") during the 15th Annual Dearborn Arab International Festival (hereinafter "Arab Festival"), which was held from June 18, 2010, to June 20, 2010.  Defendants' policies, practices, customs, and/or procedures will continue to deprive Plaintiffs of their fundamental constitutional rights at future Arab Festivals.

2.      The City's acts, policies, practices, customs, and/or procedures, and its failure to adequately train and supervise its police officers were each a moving force behind the constitutional violations in this case.

3.      The City and its highest ranking officials, including the mayor, Defendant John B. O'Reilly, and chief of police, Defendant Ronald Haddad, in conjunction, agreement, and cooperation with numerous police officers and Arab Festival organizers, workers, volunteers, and/or security personnel conspired to and in fact did jointly engage in a pattern of conduct that

deprived Plaintiffs of their fundamental constitutional rights.   Defendants' actions were in retaliation against Plaintiffs for engaging in constitutionally protected activities.

4.      Plaintiffs seek a declaration that Defendants violated their clearly established constitutional rights as set forth in this Complaint; a preliminary and permanent injunction enjoining the enforcement of Defendants' unconstitutional acts, policies, practices, customs, and/or procedures as set forth in this Complaint; a judgment awarding nominal and compensatory damages against all Defendants for the harm caused to Plaintiffs; and a judgment awarding punitive damages against certain Defendants in their individual capacities for their reckless, wanton, intentional, and outrageous conduct, which was done with an evil motive and a callous indifference to the fundamental constitutional rights of Plaintiffs.   Plaintiffs also seek an award of their reasonable costs of litigation, including attorneys' fees and expenses, pursuant to 42 U.S.C. § 1988 and other applicable law.

## JURISDICTION AND VENUE

5.      This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this court pursuant to 28 U.S.C. §§ 1331 and 1343.   This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

6.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this court.   Plaintiffs' claims for damages are authorized under 42 U.S.C. § 1983 and by the general legal and equitable powers of this court.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**PLAINTIFFS**

8.      Acts 17 Apologetics (hereinafter "Acts 17") is an unincorporated association of individuals who seek to glorify God by promoting and defending the Gospel of Jesus Christ. Venues for its expressive activities include public lectures, training, formal debates, street debates, videos, articles, and blogging.  Plaintiffs Dr. Nabeel Qureshi and David Wood are co-founders and members of Acts 17.

9.      Acts 17 has a special ministry to Muslims.  It seeks to convert Muslims to Christianity through discussion, debate, and dialogue.  Consequently, the City, which has one of the highest Muslim populations in the country, is an important location for its ministry. Similarly, the Arab Festival, which attracts many Muslims, is an important venue for Acts 17's missionary work.

10.      Acts 17 will attend the Arab Festival in the future to engage in its expressive activity and Christian missionary work.

11.      Through its expressive activities, Acts 17 and its members directly challenge Muslim beliefs and the Muslim juridical code known as sharia law.  As a result, many Muslims oppose Acts 17's expressive activities.  Additionally, some Christian groups oppose Acts 17's missionary work because they disagree with its evangelical approach to converting Muslims.

12.      Acts 17 has engaged in its missionary work throughout the United States and overseas.  It has never encountered the difficulties or the hostility it encountered in the City during the Arab Festival.

13.      Acts 17 uses mass media, including videos, television, and the Internet, to promote its religious message and mission.  By using video, Acts 17 is able to capture a religious discussion amongst several people and multiply its impact and effectiveness by broadcasting it to

4

thousands if not millions of people through the Internet. Mass media allows Acts 17 to meaningfully engage in public debate and dialogue regarding religion in general and Islam in particular, including the threat that shariah law poses to religious freedom in this country.

14.     Plaintiff Dr. Nabeel Qureshi is an adult resident of the State of Virginia and a citizen of the United States. He is a Christian with a deeply-held religious conviction to proclaim the Gospel of Jesus Christ to Muslims.

15.     Plaintiff Qureshi is a former Muslim. His close family members, including his mother and father, are Muslims. Consequently, he harbors no ill will or hostility toward Muslims or Arab people in general.

16.     Plaintiff Qureshi's decision to become a Christian was the single most important decision in his life. As a result, he has a strong desire and conviction to share the Gospel of Jesus Christ with other Muslims so as to bring them to Christ.

17.     Plaintiff Qureshi is a Christian missionary who seeks to promote and defend the Gospel of Jesus Christ. As part of his Christian missionary efforts, Plaintiff Qureshi travels around the country and overseas promoting his religious beliefs through discussion, debate, dialogue, and the distribution of Christian literature. Due to its large Muslim population, the City is an important location for his missionary work.

18.     As part of his missionary work, Plaintiff Qureshi uses video footage as a way of promoting his religious message. He also uses video footage to protect himself and his fellow Christians from false accusations and charges, particularly when they are evangelizing Muslims at the Arab Festival. Plaintiff Qureshi frequently posts his video footage on the Internet as a way of expressing his religious message and beliefs, and he uses his video footage in Christian television broadcasting.

19.     Plaintiff David Wood is an adult resident of the State of New York and a citizen of the United States.  He is a Christian with a deeply-held religious conviction to proclaim the Gospel of Jesus Christ to Muslims.  As part of his Christian missionary efforts, Plaintiff Wood travels around the country and overseas promoting his religious beliefs through discussion, debate, dialogue, and the distribution of Christian literature.  Due to its large Muslim population, the City is an important location for his missionary work.

20.     As part of his missionary work, Plaintiff Wood uses video footage as a way of promoting his religious message.  He also uses video footage to protect himself and his fellow Christians from false accusations and charges, particularly when they are evangelizing Muslims at the Arab Festival.  Plaintiff Wood frequently posts his video footage on the Internet as a way of expressing his religious message and beliefs, and he uses his video footage in Christian television broadcasting.

21.     Plaintiff Paul Rezkalla is an adult resident of the State of New York and a citizen of the United States.  He is an Arab Christian with a deeply-held religious conviction to proclaim the Gospel of Jesus Christ to Muslims.  As part of his Christian missionary efforts, Plaintiff Rezkalla travels around the country distributing Christian literature during festivals and at mosques.

22.     Plaintiff Rezkalla uses video footage as a way of promoting his religious beliefs.  He also uses video footage to protect himself and his fellow Christians from false accusations and charges, particularly when they are evangelizing Muslims at the Arab Festival.

23.     Plaintiff Negeen Mayel is an adult citizen of the United States and a student attending college in Texas.  Plaintiff Mayel is a recent convert to Christianity.  She is a former Muslim, and her close family members, including her mother and father, are Muslims.

Consequently, Plaintiff Mayel harbors no ill will or hostility toward Muslims. Plaintiff Mayel's family fled Afghanistan in the 1990's as a result of the Soviet invasion.

24.     Plaintiff Mayel has a deeply-held religious conviction to proclaim the Gospel of Jesus Christ to Muslims.

25.     Plaintiff Mayel uses video footage as a way of promoting her religious beliefs. She also uses video footage to protect herself and her fellow Christians from false accusations and charges, particularly when they are evangelizing Muslims at the Arab Festival.

26.     Plaintiff Joshua Hogg is an adult resident of the State of Michigan and a citizen of the United States. He is a professional videographer at a Christian television studio. As part of his duties as a videographer for the Christian studio, Plaintiff Hogg attends various festivals, rallies, and other events, recording video footage for television broadcasting.

27.     Plaintiff Hogg is a Christian. He uses video footage as a way of promoting his religious beliefs and for his studio to promote its Christian message. He also uses video footage to protect himself and his fellow Christians from false accusations and charges, particularly when they are evangelizing Muslims at the Arab Festival.

28.     Plaintiffs Acts 17, Qureshi, Wood, and Hogg use their video footage for journalistic purposes as well. These Plaintiffs use their video footage in the production of Christian television broadcasts, and they publish their videos on the Internet.

**DEFENDANTS**

29.     Defendant City is a municipal entity organized and existing under the laws of the State of Michigan. It is a municipal corporation with the right to sue and be sued.

30.     The City and its officials are responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures,

and/or customs of the City, including the policies, practices, and procedures of its police department as set forth in this Complaint.

31.     The City and its officials are also responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs that deprived Plaintiffs of their fundamental constitutional rights during the Arab Festival.   These rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs were the moving force behind the actions that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

32.     At all relevant times, the City trained, supervised, and employed its police officers, including Defendants Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, and John Doe Police Officers 1 through 9 (collectively referred to as Defendant police officers).   The acts, policies, practices, customs, and/or procedures of the City and its police department were the moving force behind the constitutional violations set forth in this Complaint.   The deficient training and supervision of these officers, which were done with deliberate indifference as to their known or obvious consequences, were also a moving force behind the actions that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

33.     The City approved of and ratified the acts, policies, practices, customs, and/or procedures of its police department and its police officers, including Defendant police officers, that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

34.     Defendant John B. O'Reilly is the mayor of the City.   At all relevant times, he was an agent, servant, and/or employee of the City, acting under color of state law.   As the mayor, he is the City's chief executive officer and the immediate supervisor of the chief of police

and the City's prosecuting attorneys.  In his official capacity as mayor, Defendant O'Reilly was the moving force behind the actions that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.  Defendant O'Reilly is sued individually and in his official capacity as mayor of the City.

35.     Defendant Ronald Haddad is the chief of police for the City Police Department. At all relevant times, he was an agent, servant, and/or employee of the City, acting under color of state law.  As the chief of police, he is responsible for the acts, policies, practices, customs, and/or procedures of the police department that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

36.     As the chief of police, Defendant Haddad is also responsible for the training and supervision of the City's police officers, including the training and supervision of Defendants Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, and John Doe Police Officers 1 through 9.  The deficient training and supervision of these officers were done with deliberate indifference as to their known or obvious consequences and were the moving force behind the actions that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

37.     Defendant Haddad was responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs that deprived Plaintiffs of their fundamental constitutional rights during the Arab Festival as set forth in this Complaint.  These rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs were the moving force behind the actions that deprived Plaintiffs of their fundamental constitutional rights.  Defendant Haddad is sued individually and in his official capacity as chief of police for the City Police Department.

38.     Defendant Jeffrey Mrowka is a sergeant with the City Police Department and the department's special events coordinator.  As the special events coordinator, he is responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs that deprived Plaintiffs of their fundamental constitutional rights during the Arab Festival as set forth in this Complaint.  At all relevant times, Defendant Mrowka was an agent, servant, and/or employee of the City, acting under color of state law.  Defendant Mrowka is sued individually and in his official capacity as a police officer for the City Police Department.

39.     Defendants Brian Kapanowski, Justin Smith, Andrew Ballard, Jarod Micalleff, Mark Matteocci, and A. (first name unknown) Fawaz are police officers for the City Police Department.  At all relevant times, Defendants Kapanowski, Smith, Ballard, Micalleff, Fawaz, and Matteocci were agents, servants, and/or employees of the City, acting under color of state law.  Defendants Kapanowski, Smith, Ballard, Micalleff, Matteocci, and Fawaz acted jointly to deprive Plaintiffs Qureshi, Wood, Rezkalla, and Mayel of their fundamental constitutional rights on or about June 18, 2010, and June 19, 2010, as set forth in this Complaint.  Defendants Kapanowski, Smith, Ballard, Micalleff, Matteocci, and Fawaz are sued individually and in their official capacities as police officers for the City Police Department.

40.     Defendant R. (first name unknown) Gafford is a police officer for the City Police Department.  At all relevant times, Defendant Gafford was an agent, servant, and/or employee of the City, acting under color of state law.  Defendant Gafford and Defendants John Doe Police Officers 1 through 7 acted jointly to deprive Plaintiffs Wood, Rezkalla, and Hogg of their fundamental constitutional rights during the Arab Festival on or about June 20, 2010, as set forth

in this Complaint.  Defendant Gafford is sued individually and in his official capacity as a police officer for the City Police Department.

41.     Defendants John Doe Police Officers 1 through 9, fictitious names of unknown persons, are police officers for the City Police Department.   At all relevant times, Defendants John Doe Police Officers 1 through 9 were agents, servants, and/or employees of the City, acting under color of state law.   Defendants John Doe Police Officers 1 through 9 acted jointly to deprive Plaintiffs Wood, Rezkalla, and Hogg of their fundamental constitutional rights during the Arab Festival on or about June 20, 2010, as set forth in this Complaint.  Defendants John Doe Police Officers 1 through 9 are sued individually and in their official capacities as police officers for the City Police Department.

42.     At all relevant times, Defendant Fay Beydoun was the executive director of the American Arab Chamber of Commerce (hereinafter "AACC").   AACC and the City jointly organize and conduct the annual Arab Festival and have thus created a symbiotic relationship and joint partnership such that the acts of the Arab Festival and its organizers, workers, and/or volunteers are fairly attributable to the City.  Defendant Beydoun was responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs that deprived Plaintiffs of their fundamental constitutional rights during the Arab Festival as set forth in this Complaint.  At all relevant times, Defendant Beydoun conspired and/or worked jointly with Defendants City, O'Reilly, Haddad, Mrowka, Haidous and/or other Defendants and festival volunteers, workers, and/or security personnel, including Amal Alslami and Roger Williams, to deprive Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.  Defendant Beydoun is sued individually and in her official capacity as executive director of AACC.

43.     At all relevant times, Defendant Norma Haidous was the special events coordinator and executive assistant for AACC.  Defendant Haidous was responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs that deprived Plaintiffs of their fundamental constitutional rights during the Arab Festival as set forth in this Complaint.  At all relevant times, Defendant Haidous conspired and/or worked jointly with Defendants City, O'Reilly, Haddad, Mrowka, Beydoun and/or other Defendants and festival volunteers, workers, and/or security personnel, including Amal Alslami and Roger Williams, to deprive Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.  Defendant Haidous is sued individually and in her official capacity as special events coordinator and executive assistant for AACC.

## STATEMENT OF FACTS

**A.      The City and the Arab Festival and Its Organizers Maintain a Joint Partnership and Symbiotic Relationship.**

44.     The City contains one of the largest Muslim communities in the United States.  It is estimated that out of 98,000 inhabitants, nearly 30,000 are Muslims.  Consequently, the City is an important place for Plaintiffs' religious speech activities and missionary work.

45.     For the past fifteen years, the annual Arab Festival was held in the City.  The City will continue to hold and sponsor the Arab Festival in the future.

46.     In 2010, the City Council authorized the Arab Festival to take place on Warren Avenue, between Hartwell and Kingsley Streets, and on Miller Road, between Warren Avenue and Blesser Street.  The actual festival activities occurred mostly on Warren Avenue, with a few activities held on Miller Road.

47.     On May 17, 2010, the City Council unanimously passed a resolution, authorizing the 2010 Arab Festival as follows (emphasis added):

RESOLVED: That the American Arab Chamber of Commerce and A.C.C.E.S.S. be and they are hereby granted permission to conduct the 15th Annual Dearborn Arab International Festival on the following dates: Friday, June 18 from 4:00 P.M. to 11:00 P.M., Saturday, June 19 from 11:00 A.M. to 11:00 P.M. and Sunday, June 20, 2010 from 11:00 A.M. to 9:00 P.M., <u>subject to all applicable ordinances and the rules and regulations of the Police Department</u>; be it further

RESOLVED: That to facilitate and continue to ensure that adequate traffic safety/control measures are in place, the 2010 Dearborn Arab International Festival <u>outer perimeter</u> boundaries will be as follows: Warren Avenue between Hartwell and Kingsley Streets; Miller Road between Warren Avenue and Blesser Street; be it further

RESOLVED: That City Council hereby authorizes the closure of the following roadways:
- Miller Road between Warren Avenue and Blesser Street on Thursday, June 17, 2010 at 4:00 P.M. and re-opened on Monday, June 21, 2010 at 6:00 A.M.
- Warren Avenue between Hartwell and Kingsley Streets on Thursday, June 17, 2010 at 6:00 P.M. and re-opened on Monday, June 21, 2010 at 6:00 A.M.
- Warren Avenue between Hartwell and Reuter Streets on Friday, June 18, 2010 from 5:00 P.M. until 8:00 P.M. in order to accommodate the VIP Reception and Ribbon Cutting Ceremony.

be it further

RESOLVED: That City Council hereby <u>authorizes the American Arab Chamber of Commerce to issue all sidewalk sales permits</u> for the event within the designated festival boundaries; be it further

RESOLVED: That in a continued effort to reduce the traffic impact to the immediate surrounding neighborhoods, the City Council hereby authorizes the use of the City-owned vacant lots off Lonyo Street for additional off-site festival parking; be it further

RESOLVED: That City Council hereby <u>authorizes assistance from the Dearborn Police, Fire, Public Works, Economic & Community Development and Recreation Departments</u> to insure a safe, healthy, fun and successful event.

48.     The resolution was unanimously adopted by the City Council, which establishes policy for the City.

49.     The City Council expressly authorizes the conduct of the Arab Festival, subject to the rules and regulations of the City Police Department.  Consequently, all festival rules and regulations, including the rules and regulations that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint, must be approved or ratified by the City

through its police department.  The City Police Department enforces the rules and regulations of the Arab Festival, specifically including the rules and regulations that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

50.     The Arab Festival is held on the City streets; it is not held on the public sidewalks.  The City erects barriers to separate the sidewalks from the festival, which is a street festival held mostly on Warren Avenue.

51.     Sidewalk sales permits are covered by City ordinance.  Pursuant to the ordinance, the City is vested with the authority to issue such permits, which is a government function. However, in 2009 and again in 2010, that governmental authority was granted by the City, through its officials, to the festival organizers, specifically including Defendant Beydoun.

52.     During the 2009 Arab Festival, the sidewalk sales blocked pedestrian traffic and created safety and control hazards.

53.     In 2010, Defendants City, Haddad, Mrowka, and Beydoun did not issue any sidewalk sales permits, thereby keeping the sidewalks open for all pedestrian traffic, including pedestrian traffic unrelated to the Arab Festival.  As a result, the sidewalks adjacent to Warren Avenue and Miller Road were open to the general public.  Consequently, there was no basis for Defendants to prohibit Plaintiffs from distributing their religious literature on these sidewalks during the 2010 Arab Festival.

54.     As in past years, the City closed certain roads for vehicle traffic during the Arab Festival.  However, the public sidewalks remained open for pedestrian traffic, including pedestrian traffic not associated with the festival.  For example, local businesses along Warren Avenue remained open, and pedestrians visited these businesses for commercial purposes unrelated to the Arab Festival while the festival was being held.

14

55.     Defendants made special provisions to accommodate the businesses along Warren Avenue to ensure that the public sidewalks, including those immediately adjacent to the Arab Festival, remained open for pedestrians who had no interest in attending the festival, but wanted to patronize the businesses instead.  This accommodation was made to assist and promote the Warren Avenue businesses.  Consequently, the adjacent public sidewalks were not closed for the festival, nor were they used exclusively for festival activities.  These sidewalks remained open for use by the general public for purposes unrelated to the festival.

56.     In addition to the boundaries where the actual Arab Festival activities took place (Warren Avenue and Miller Road), Defendants also placed barriers on the public streets to restrict vehicle traffic beyond the actual festival boundaries.   These barriers were placed approximately one block to the north (along Morrow Circle), one block to the south (along Blesser Street), five blocks to the west (along Schaefer Road) and approximately three blocks to the east (along Middlepoint and Kingsley Streets) of the festival boundaries (hereinafter referred to as the "outer perimeter").  The outer perimeter was created so as to give vehicle traffic some final point to turn away from the Warren Avenue destination.  There were no restrictions on pedestrian traffic in the outer perimeter.

57.     The outer perimeter was established at the 2009 Arab Festival and again at the 2010 Arab Festival.  Defendants intend to establish a similar outer perimeter for future Arab Festivals.

58.     The City is actively involved in the conduct and support of the Arab Festival, providing numerous services from various City departments, including the Police, Fire, Public Works, Economic & Community Development, and Recreation Departments.  Consequently, the City is a joint partner in the operation of the festival.

59.     The City Council expressly authorizes the use of City services to operate and support the festival.

60.     City officials, including Defendants O'Reilly and Haddad, participate in the opening ceremony for the Arab Festival.

61.     The City allows the use of its official seal in the public advertising and marketing of the Arab Festival.

62.     Arab Festival organizers, including Defendants Beydoun and Haidous, hold numerous planning meetings that are attended by City officials, including Defendant Mrowka.

63.     City officials actively participate in the planning and execution of the Arab Festival.

64.     The City provides guidance and training for festival volunteers and festival security guards.  In particular, the City Police Department provides a six hour block of training from its training department for the festival security guards, instructing them on how to provide support for the City police during the festival.

65.     There is an entire network of people, including festival volunteers and festival security, that Defendant Mrowka was responsible for overseeing at the 2010 Arab Festival in his official capacity as the special events coordinator for the City Police Department.

66.     Festival volunteers, festival security, and City police officers communicate with each other during the Arab Festival via a shared radio network.  City police officers monitor the communications of the festival volunteers and festival security personnel.

67.     City officials, including Defendants Haddad and Mrowka, review, ratify, and approve the various applications, rules, regulations, and restrictions of the Arab Festival, which are enforced by City police officers, including Defendant police officers, including the rules,

regulations, and restrictions that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

68.     The City Police Department established a mobile command trailer in the center of the Arab Festival, and the City employed uniformed police officers to enforce the rules, regulations, and restrictions of the festival, including the rules, regulations, and restrictions used to deprive Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

69.     During the Arab Festival, City police officers, including Defendant police officers, patrol the public sidewalks and other public areas to enforce the festival rules, regulations, and restrictions, including the rules, regulations, and restrictions that were used to deprive Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

70.     It was the duty of the festival volunteers, festival security, and the City Police Department and its officers to work as a team to enforce the rules, regulations, and restrictions of the Arab Festival, including the rules, regulations, and restrictions that were used to deprive Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

71.     Pursuant to City ordinance, a private sponsor of a special event receiving City services is required to enter into a contract to repay the cost for those services.  However, because the City and Arab Festival organizers work jointly as partners and have created a symbiotic relationship with regard to the Arab Festival, the City provides its services at no cost to the festival and its organizers.  Instead, these costs are incurred by City taxpayers.

72.     In 2009, for example, the City contributed approximately $41,580 worth of police services alone to the Arab Festival.  Similar costs were incurred by taxpayers for the 2010 Arab Festival.

73.     Because the City and the Arab Festival organizers, including Defendants Beydoun and Haidous, work jointly as partners and have created a symbiotic relationship with regard to this festival, the City provides preferential treatment to the Arab Festival and its organizers. Examples of this preferential treatment include the following: the City, through its officials, suspends the enforcement of its ordinance that requires the repayment of public services for such events; it suspends the enforcement of its ordinance on literature distribution, which deters and restricts certain Christian groups, such as Acts 17, from proselytizing Muslims at the festival; and in 2009 and again in 2010, it granted festival organizers the authority to issue sidewalk vending permits, which is a governmental function performed pursuant to a City ordinance.

74.     The City ordinance dealing with the distribution of noncommercial literature, such as the religious literature distributed by Plaintiffs, expressly states, "It shall not be unlawful for any person to hand out or distribute, without charge to the receiver thereof, any noncommercial handbill in any public place to any person willing to accept such noncommercial handbill."  (emphasis added).  The Arab Festival is a public place.

75.     Defendants City, Haddad, and Mrowka, jointly and in cooperation with the Arab Festival and its organizers, including Defendants Beydoun and Haidous, prohibit the distribution of literature in the public places immediately adjacent to the public streets where the festival activities take place and in the public places in the outer perimeter.  This restriction is selectively enforced against certain Christians and Christian organizations, including Plaintiffs.

76.     The City and its officials, including Defendants O'Reilly, Haddad, and Mrowka, have created a symbiotic relationship and joint partnership with the Arab Festival and its organizers, including Defendants Beydoun and Haidous, such that the acts of the Arab Festival and its organizers, workers, and/or volunteers, including Defendant Beydoun, Defendant

Haidous, Amal Alsami, and Roger Williams, as set forth in this Complaint, are fairly attributable to the City and properly considered state action.

**B.      Prior to 2009, the Arab Festival Was a Safe Place for Christian Missionaries.**

77.      Prior to 2009, Christian missionaries, including Plaintiff Wood, visited the City to express their religious message to persons attending the Arab Festival.

78.      Prior to 2009, and specifically including 2004 to 2008, Christian missionaries freely roamed the perimeter of the Arab Festival, handing out religious literature and discussing their Christian faith on the public sidewalks and other public areas in the City.  This included distributing literature on the public sidewalks immediately adjacent to Warren Avenue and Miller Road and in the outer perimeter.  The Christian missionaries distributed their literature to people who came to the Warren Avenue area to attend the Arab Festival and to those people who came to Warren Avenue to patron the various businesses unrelated to the festival.

79.      Permitting Christian missionaries to peacefully distribute their religious literature and discuss their faith on the public streets and sidewalks adjacent to the Arab Festival, including the public places within the outer perimeter, never caused any disruption, nor did these peaceful activities block or obstruct in any way the pedestrian traffic along the sidewalks or public streets adjacent to the Arab Festival.

80.      Prior to 2009, there was little to no conflict between the Christian missionaries and the Muslims who attended the Arab Festival.  That would change in 2009 as Defendants, including the City, Haddad, Mrowka, and Beydoun, instituted drastic restrictions on the rights of certain Christian missionaries, including Plaintiffs, to evangelize at the Arab Festival.

**C.    The 2009 Arab Festival: a Public Embarrassment for the City and Festival Organizers.**

81.    In 2009, there was a regime change that affected the rules and regulations at the Arab Festival.  Defendant Haddad took over as the chief of police, Defendant Beydoun took over as executive director for AACC, and Defendant Mrowka took over as the special events coordinator for the City Police Department.

82.    With this regime change came draconian restrictions on the right to distribute literature and the concomitant ability to effectively evangelize Muslims.  Christian missionaries were no longer permitted to distribute their religious literature on the public sidewalks adjacent to Warren Avenue and Miller Road.  Moreover, Defendants Haddad, Mrowka, and Beydoun created the outer perimeter, which had the purpose and effect of keeping the Christian missionaries and their religious literature several blocks away, thereby preventing the missionaries from effectively evangelizing Muslims at the Arab Festival.

83.    In 2009, Plaintiffs Qureshi and Wood, along with Mary Jo Sharp, visited the Arab Festival.  They carried with them a small, handheld video camera.

84.    During this visit to the 2009 Arab Festival, the Christian missionaries did not distribute religious literature.  Instead, they peacefully discussed their Christian faith with festival goers, including several Muslims, in an effort to evangelize and convert the Muslims to the Christian faith.

85.    On Friday, June 19, 2009, Plaintiffs Qureshi and Wood visited a booth at the 2009 Arab Festival that was occupied by Muslim apologists.  A sign on the booth invited festival goers to ask the Muslims about Islam.  The sign read: "Islam: Got questions? Get answers."  Plaintiffs Qureshi and Wood had a lengthy, peaceful discussion with the Muslims at the booth.  Before they left the festival for the evening, Plaintiffs Qureshi and Wood accepted some of the

20

pro-Islamic and anti-Christian pamphlets and CDs that were being distributed at the booth. Plaintiffs Qureshi and Wood told the Muslims that they would examine the materials carefully and return to the booth on Sunday, June 21, 2009, for further discussion and dialogue.

86.     On Saturday, June 20, 2009, and during the morning and afternoon of Sunday, June 21, 2009, Plaintiffs Qureshi and Wood gave several lectures and engaged in moderated, public debates with Muslims on various issues.  Following these lectures and debates, Plaintiff Qureshi, Plaintiff Wood, and Sharp returned to the Arab Festival on Sunday to share their faith and to continue the discussion and dialogue they had started with the group of Muslims at the booth.

87.     While Plaintiff Wood was talking to a fellow Christian inside one of the tents at the festival, Defendant Haidous approached him and asked him for a pamphlet that was in his pocket.  Since Muslim security guards and festival workers had been asking Christians for materials in order to entrap them and have them removed from the festival for violating the policy against distributing literature outside of booths (*see* Literature Distribution Restriction, *infra*), Plaintiff Wood refused to hand her anything.  Defendant Haidous then informed Plaintiff Wood that he would only be allowed to discuss Christianity if he moved to a specific area of the festival.

88.     As Plaintiff Wood was busy asking Defendant Haidous why he was not allowed to freely discuss Christianity at the festival, Plaintiff Qureshi was approaching the Muslim booth to ask a question about one of the pamphlets being distributed by the Muslims.  Sharp was operating a small, handheld video camera to record the discussion.

89.     Although the Muslims at the booth gave Plaintiff Qureshi and Sharp permission to videotape the conversation, a group of security guards led by Defendant Haidous, who had

broken off her discussion with Plaintiff Wood, arrived at the booth, surrounded Sharp, and ordered her to turn off the camera.  Defendant Haidous then slapped the camera, grabbed the front of it, and pulled it down, forcing Sharp to turn it off.  Following this assault, Plaintiff Wood quickly escorted Sharp out of the tent to protect her from any further attacks.

90.     Plaintiffs Wood and Qureshi, along with Sharp, approached an individual whom they knew to be an off-duty police officer who did not work for the City to get his opinion regarding the actions of Plaintiff Haidous and the festival security personnel.  The officer informed Plaintiffs that it is legal to videotape at public events, such as the Arab Festival, and that Defendant Haidous had no right to slap the camera or force Sharp to turn it off.

91.     Following this discussion, Plaintiffs Wood and Qureshi approached three security personnel who identified themselves as police officers, and Plaintiff Qureshi asked if there was any rule against videotaping or having a discussion.  The security personnel answered, on camera, that they had no objections to videotaping or having a dialogue at the festival.  This response was consistent with a response Plaintiff Qureshi had previously received from a uniformed, City police officer at the festival.

92.     Plaintiffs Wood and Qureshi returned to the Muslim booth to continue the discussion that had been interrupted by Defendant Haidous and the festival security personnel.  Plaintiff Wood carried a small, handheld video camera in order to record the dialogue.  Sharp acquired a second small video camera from their car and recorded from a distance in case the security guards overstepped their bounds again.

93.     Due to the disruption previously caused by Defendant Haidous and the festival security personnel, the Muslims at the booth were no longer interested in having a discussion. As a result, Plaintiffs Wood and Qureshi left the tent.

94.     Once outside of the tent, Plaintiff Wood saw Defendant Haidous walking, and he videotaped her for a moment to have a record of the festival worker who attacked Sharp.  A true and accurate copy of a photograph of Defendant Haidous at the 2009 Arab Festival is attached to this Complaint as Exhibit 1.

95.     A few minutes later, two youths, who can be seen on Plaintiffs' video conspiring with festival security guards, approached Plaintiffs Wood and Qureshi.  Plaintiff Qureshi was holding in his hand a pamphlet that was being distributed by the Muslims at the booth.  One of the youths snatched the pamphlet from Plaintiff Qureshi's hand and brought it to a security guard in an obvious attempt to frame Plaintiffs for violating the Literature Distribution Restriction. The security guard that was approached by the youth then gave a signal to the other security personnel.

96.     Immediately following this signal, numerous Arab Festival security guards began surrounding Plaintiffs Wood and Qureshi in a threatening manner.  When one of the guards noticed Sharp videotaping their actions, he grabbed the camera and forced her arm down.  On several occasions, Arab Festival security guards physically assaulted Plaintiff Wood, Plaintiff Qureshi, and Sharp.  The security guards and workers eventually forced Plaintiff Qureshi, Plaintiff Wood, and Sharp to leave the festival under duress.  True and accurate photographs of the assault by the festival security guards are attached to this complaint as Exhibit 2.

97.     As they were being physically forced out of the festival by the security guards and festival workers, Plaintiffs Qureshi and Wood called for police assistance and spoke with Defendant Mrowka, who arranged for a police escort to allow the Christians to leave the festival without any further harassment by the security guards or festival workers.

98.    The 2009 incident with the festival security guards and workers was captured on video by Plaintiff Qureshi, Plaintiff Wood, and Sharp and eventually became the subject of several YouTube videos.

99.    Following this incident with the festival security guards and workers, Plaintiff Qureshi, Plaintiff Wood, and Sharp arranged a meeting with Robert Farris, a detective with the City Police Department.  During this meeting, which was attended by Plaintiff Wood and Sharp, Detective Farris viewed the video footage of the incident at the 2009 Arab Festival.  Based on his view of this video evidence, Detective Farris opined that three individuals in the video could be criminally charged for assaulting Plaintiff Qureshi, Plaintiff Wood, and Sharp.  One of those individuals was Defendant Haidous.

100.    Detective Farris gave Plaintiff Qureshi, Plaintiff Wood, and Sharp three options. First, they could pursue criminal charges against the three offending festival workers.  Second, Detective Farris could try to arrange a meeting between the Christian missionaries and the offending festival workers to discuss the situation.  Or third, Detective Farris could coordinate with the festival organizers, which would include Defendant Beydoun, to ensure that the three offending festival workers would not be allowed to attend the 2010 Arab Festival.  Plaintiffs believed that this final option would help make the festival a safer place for them and Christian missionaries in general.

101.    Not wanting to create any rifts in the community by seeking criminal charges against the offending festival workers, who Plaintiffs believe are Muslims, Plaintiff Qureshi, Plaintiff Wood, and Sharp chose the third option, believing that the City and the festival organizers would take steps to ensure that future Arab Festivals would be more welcoming for Christian missionaries such as Plaintiffs.  Plaintiffs were mistaken.

102.    Plaintiff Wood sent an email to Defendants Beydoun and Haidous, among others, in 2009, offering them and their organization an opportunity to explain what had happened and perhaps to apologize to Plaintiffs for the way they were treated at the festival and to assure them that it would never happen again.  Defendants never responded.

103.    The video footage of the 2009 encounter at the Arab Festival was posted by Plaintiffs Acts 17, Qureshi, and Wood on YouTube with the subtitle: "Special Report: Sharia in the United States."  This video has had more than two million views, and it generated a great deal of negative publicity for the Arab Festival and its organizers and workers, including Defendants Beydoun and Haidous, and the City and its officials, including Defendants O'Reilly, Haddad, and Defendant police officers.

104.    Plaintiffs Acts 17, Qureshi, and Wood also posted on YouTube a video showing a booth at the Arab Festival where Muslims were distributing t-shirts portraying a child urinating on the Israeli flag and a video discussing Defendant Haidous and other festival workers who were trying to have Christian missionaries removed from the Arab Festival by entrapping them, similar to how they tried to entrap Plaintiffs.

**D.    The City and Its Mayor Publicly Attack Plaintiffs for Exercising their Constitutional Rights.**

105.    Because the City received so many negative letters, emails, and/or phone calls following the posting of the 2009 YouTube videos, Defendants City and O'Reilly went on the offensive and publicly denounced Plaintiffs Acts 17, Qureshi, and Wood, knowingly making false, defamatory statements about Plaintiffs and blaming them for the incident.  Defendants City and O'Reilly made these false, defamatory statements knowing they were false or recklessly disregarding the fact of their falsity.

25

106.     The release of the YouTube videos also prompted Defendant O'Reilly to pressure local religious leaders to publicly denounce Plaintiffs Acts 17, Qureshi, and Wood in a written letter that Defendants City and O'Reilly publicly posted and continue to post on the City's official website.

107.     The religious leaders who were pressured by Defendant O'Reilly believed that if they did not act pursuant to the mayor's desires, they would lose political influence in the City. At a minimum, they believed that they would be discriminated against at future Arab Festivals, including being denied access to preferred locations within the festival.

108.     City officials, including Defendants O'Reilly, Haddad, and Mrowka, and Arab Festival organizers, including Defendants Beydoun and Haidous, were upset and embarrassed by the negative publicity generated by the 2009 YouTube videos produced and published by Plaintiffs Acts 17, Qureshi, and Wood.  As a result, Defendants planned and conspired to ensure that the City and the Arab Festival did not receive such negative publicity in the future by publicly attacking and injuring the reputation of Plaintiffs and by targeting Plaintiffs for adverse and discriminatory treatment, as set forth in this Complaint.

109.     Plaintiffs Acts 17, Qureshi, and Wood posted the YouTube videos of the incident at the 2009 Arab Festival as an exercise of their rights to freedom of speech and of the press and the free exercise of religion.  Defendants would retaliate against Plaintiffs during the 2010 Arab Festival for exercising those rights.

110.     No City official, including Defendants O'Reilly, Haddad, and Mrowka, nor festival organizer, including Defendant Beydoun, took any adverse action against the security guards or festival workers who physically harassed and assaulted Plaintiff Qureshi, Plaintiff

26

Wood, and Sharp at the 2009 Arab Festival.  In fact, they allowed Defendant Haidous to return to the festival in 2010, contrary to the assurance provided by Detective Farris.

111.    Instead of punishing the festival workers who assaulted Plaintiff Qureshi, Plaintiff Wood, and Sharp, City officials, including Defendant O'Reilly, sought to punish Plaintiffs Acts 17, Qureshi, and Wood, and blame them and their religious beliefs and practices for the 2009 incident.

112.    In a press release (hereinafter "City Press Release") posted on its website following the 2010 Arab Festival, the City stated, "The City of Dearborn believes the 2009 Acts 17 Apologetics videos are a distortion of the group's experience and a misrepresentation of the Dearborn Arab International Festival."

113.    In response to the YouTube videos, Defendant O'Reilly hosted a meeting with the Dearborn Area Ministerial Association in September 2009.  It was during this meeting that Defendant O'Reilly pressured local religious leaders to publicly admonish, criticize, and denounce Plaintiffs Acts 17, Qureshi, and Wood for their religious beliefs and practices, as alleged previously.

114.    As a result of this meeting with Defendant O'Reilly, a public letter, which was and continues to be published on the official website of the City through the City Press Release, was issued by these religious leaders.  The letter, entitled, "Response to Acts 17 Apologetics' 'Special Report: Shari'a in the United States' by Concerned Followers of Jesus in Dearborn," criticizes the religious and free speech activities of Plaintiffs Acts 17, Qureshi, and Wood, and it does so by claiming that the religious beliefs and practices of Plaintiffs Acts 17, Qureshi, and Wood are contrary to the Bible and the Christian faith.

115.     In the City Press Release, the City states, "These Dearborn evangelical pastors later issued a lengthy statement stating they believe in the right to spread the message of Christianity, but criticized the tactics and behavior of members of Acts 17 Apologetics, saying they did not reflect a Christian spirit."  This statement was followed by a link to the letter from the "evangelical pastors" that criticized Plaintiffs Acts 17, Qureshi, and Wood.

116.     The letter from the pastors, which was and continues to be officially endorsed, promoted, and published by Defendants City and O'Reilly, states, in relevant part, the following (emphasis added):

> That they were in conflict with the security guards had more to do with how they set out to provoke a reaction than it did with actually sharing the Gospel or refuting error.  ***The words of the Apostle Peter (1 Peter 4:15) are clear and very applicable to this situation***:
>
> > "If you're abused because of Christ, count yourself fortunate.  It's the Spirit of God and his glory in you that brought you to the notice of others.  If they're on you because you broke the law *or disturbed the peace*, that's a different matter…"  <u>The Message</u>
>
> As ones who have been active in sharing our faith unashamedly with Muslim and non-Muslim, it seems to us that filming yourself as you share the Gospel–or even as you attempt to correct error–***is the last thing a genuine witness for Christ would do***!
>
> Back in 1 Peter 3:15-16 (NIV) Peter gave us this exhortation:
> > "But in your hearts revere Christ as Lord.  Always be prepared to give an answer to everyone who asks you to give the reason for the hope that you have."
>
> This exhortation is very clear.  Do not be ashamed of the Gospel!  Do not be timid in sharing with others the hope that you have in Christ!  We would suggest that the intent of the Apostle's words go even further:  Don't be afraid to boldly speak the truth and expose falsehood!  ***But–and this is vitally important and to the present point–Peter goes on to add the following injunction that is often (as in this case?) ignored***:
>
> > "But do this with gentleness and respect, keeping a clear conscience, so that those who speak maliciously against your good behavior in Christ may be ashamed of their slander."

28

We are concerned that, ***rather than following Peter's injunction to share Christ*** and the hope that they have in him with gentleness and respect (thus provoking shame in others for how they may wrongly respond to that witness), ***Acts 17 Apologetics has actually brought shame to the name of Christ because of the spirit with which they conducted themselves during the Arab-American festival in Dearborn this year***.

117.    By encouraging the drafting of this letter admonishing the religious beliefs and practices of Plaintiffs Acts 17, Qureshi, and Wood and by officially endorsing and promoting the content of this letter by posting links to it on the City's official website and in the official comments by the mayor, Defendants City and O'Reilly are officially endorsing, promoting, and preferring certain Christian views, beliefs, and religious practices over other Christian views, beliefs, and religious practices.

118.    The City Press Release also favorably and officially endorses the views expressed by "[w]orld renowned Christian minister, author, and speaker Josh McDowell" and his approach to evangelizing, stating, in part, "At the 2009 festival, Josh McDowell also spent time filming, interviewing, and speaking to event attendees regarding Christianity.  The video posting by Josh McDowell showed quite a contrasting view from the video posting of Acts 17 Apologetics."  A link to Josh McDowell's 2009 video, which is entitled, "Dearborn Arab Festival: Sharia Love in the USA," is posted by the City.  A true and accurate copy of the YouTube page showing this video is attached to this Complaint as Exhibit 3.

119.    The City Press Release further states, "Josh McDowell also attended the 2010 Dearborn Arab International Festival and posted a video on 'YouTube' on June 28, 2010 documenting the Dearborn event.  At the 2010 festival, Josh McDowell continued to spend time filming, interviewing, and speaking to event attendees regarding Christianity.  This video posting by Josh McDowell also shows a contrasting view from the one posted by Acts 17 Apologetics."  A link to this 2010 video by Josh McDowell, which is entitled, "Arrested in Dearborn? Not!

Sharia Love in Dearborn 2010," is also posted by the City.  A true and accurate copy of the YouTube page showing this video is attached to this Complaint as Exhibit 4.  The City does not provide any links to the videos created by Acts 17 Apologetics.

120.    In a "comment" posted on YouTube by Josh McDowell related to the 2009 video of his experience at the Arab Festival, McDowell makes the following remarkable and telling admission: "Proselytizing was not permitted within the festival.  *More Than a Carpenter* [a religious book] was passed out outside the festival.  Hopefully, from reading *The Witness* [a novel] which was given out within the festival, their appetites were whetted for knowing more.  They then had the opportunity to request additional material."  A true and accurate copy of the YouTube page showing this comment related to McDowell's 2009 video is attached to this Complaint as Exhibit 5.

121.    In his Arab Festival videos, McDowell praises Defendants City, O'Reilly, and Haddad.

122.    Defendants did not require McDowell to stop videotaping his interviews and discussions at either the 2009 or the 2010 Arab Festivals, nor did Defendants require him to film, interview, or speak in a so-called "Free Speech Zone" during either the 2009 or 2010 Arab Festivals.

123.    Defendants did not arrest McDowell at either the 2009 or the 2010 Arab Festivals.

124.    Defendants did not pressure religious leaders to denounce McDowell or to claim about McDowell's filming that it "is the last thing a genuine witness for Christ would do!"

125.    The City Press Release also states the following: "Dearborn Christian Pastor Haytham Abi-Haydar, who has been part of the festival since 1999, stated, 'The community has been very good to us.  From my perspective, we have never had any incidents.'  He said of David

Wood and Acts 17 Apologetics, 'Why can't he go around with no [sic] cameras, not intimidating people, ask questions and build relationships with the community and sharing Christ? Why is that difficult?'" Similar negative comments were not made or posted about McDowell and his use of video cameras at the festival, nor did the City provide quotes from the many Christians who support and approve of the religious practices of Plaintiffs and Plaintiffs' belief that sharia law is adversely influencing the City.

126. The City Press Release conveys an official government message that Plaintiffs Acts 17, Qureshi, and Wood are not true Christians.

127. The City Press Release and the actions of Defendants City and O'Reilly convey an impermissible, government-sponsored message of disapproval of and hostility toward the religious beliefs and practices of Plaintiffs Acts 17, Qureshi, and Wood, thereby sending a clear message to Plaintiffs that they are outsiders, not full members of the political community and an accompanying message that those who oppose the religious beliefs and practices of Plaintiffs are insiders, favored members of the political community.

**E.      Unconstitutional Rules and Regulations Enforced at the 2010 Arab Festival.**

128. The 2010 Arab Festival, which was the 15th annual festival, was held in the City from Friday, June 18, 2010, through Sunday, June 20, 2010. Similar to previous Arab Festivals, the 2010 festival was open to the public, and there was no admission fee required to attend the festival.

129. Similar to previous festivals, there were no written rules or regulations prohibiting persons attending the 2010 Arab Festival from using personal video cameras during the event. There were no written rules or regulations prohibiting persons attending the 2010 Arab Festival from stopping and talking with other festival goers. And there were no written rules or

regulations prohibiting persons attending the 2010 Arab Festival from discussing religion during and throughout the festival.

130.    Similar to previous festivals, festival organizers permitted organizations to establish booths at the 2010 Arab Festival to distribute religious literature and to discuss religion. Thus, religion was part of the festival, and it was a subject of discussion both within and outside of the booths.  Consequently, the festival was not limited to carnival rides, arts and crafts, and children's activities.

131.    Defendants City, Haddad, Mrowka, Beydoun, and Haidous created an *ad hoc* "***Free Speech Zone policy***" for the Arab Festival.  Pursuant to this policy, Defendants could order private citizens, including Plaintiffs, to a confined location for their speech activity based on a subjective determination that the speech could be disruptive.  The *ad hoc* Free Speech Zone created for the 2010 Arab Festival was located in the least populated area of the festival—an area where people generally did not pass—thereby limiting the efficacy of the restricted speech.  The Free Speech Zone policy allows Defendants to restrict and limit speech that they disfavor, such as Plaintiffs' speech.

132.    Defendants intend to enforce their Free Speech Zone policy against Plaintiffs at future Arab Festivals, thereby prohibiting Plaintiffs from freely discussing their Christian faith with festival goers and videotaping those discussions.

133.    Defendants did not (and do not) have in place any objective, content-neutral guidelines for determining whether a discussion or other speech activity must take place within a Free Speech Zone or whether it can take place on the public streets and sidewalks during the Arab Festival.  Consequently, there was (and is) no uniform enforcement of any rule or regulation requiring discussions amongst festival goers to take place in a Free Speech Zone.

134.    Defendants did not (and do not) have in place any objective, content-neutral guidelines for determining whether a videotaped discussion or interview must take place within a Free Speech Zone or whether it can take place on the public streets and sidewalks during the Arab Festival.   Consequently, there was (and is) no uniform enforcement of any rule or regulation requiring persons to videotape discussions or interviews within a Free Speech Zone.

135.    The official "Festival Grounds Map" for the 2010 Arab Festival did not include or identify any area as a Free Speech Zone.  A true and accurate copy of the 2010 Festival Grounds Map is attached to this Complaint as Exhibit 6.

136.    No City official, City police officer, or festival organizer, worker, volunteer, or security guard instructed Plaintiffs Qureshi, Wood, Rezkalla, or Mayel to go to a Free Speech Zone to discuss their faith and to videotape those discussions with Muslims during the 2010 Arab Festival.  The first time Plaintiffs heard anything about a Free Speech Zone was from a public statement made by Defendant O'Reilly after these Plaintiffs were arrested and jailed.

137.    If a person attending the Arab Festival wanted to discuss politics with other festival goers, he and those with whom he was speaking were not required to stand in a Free Speech Zone to do so.

138.    If a person attending the Arab Festival wanted to discuss the religion of Islam with other festival goers, he and those with whom he was speaking were not required to stand in a Free Speech Zone to do so.

139.    If a person attending the Arab Festival wanted to discuss sports with other festival goers, he and those with whom he was speaking were not required to stand in a Free Speech Zone to do so.

140.    If a person attending the Arab Festival wanted to videotape an event at the festival, including a discussion about religion, with a personal, handheld video camera, the person was not required to do so from within a Free Speech Zone.  Indeed, Josh McDowell, a Christian who finds favor with the City and who City officials, including Defendant O'Reilly, hold out publicly as the ideal Christian evangelist, was permitted by Defendants to use his video camera to videotape events, discussions, and interviews throughout the 2009 and 2010 Arab Festivals.  In fact, as previously alleged, the City posts links to McDowell's festival videos on the City's official website.

141.    To distribute literature to persons attending the Arab Festival, Defendants, including the City, Haddad, Mrowka, Beydoun, and Haidous, required the person or organization to purchase a booth at the festival (hereinafter "*Literature Distribution Restriction*").  The Literature Distribution Restriction was enforced by Defendant police officers.

142.    Pursuant to the Literature Distribution Restriction, Defendants would not permit Plaintiffs to distribute religious literature on the public sidewalks immediately adjacent to Warren Avenue and Miller Road or in the public places located in the outer perimeter.

143.    Defendants will enforce the Literature Distribution Restriction against Plaintiffs in the future and at future Arab Festivals attended by Plaintiffs.

144.    In light of the prior history (2004 to 2008) of permitting Christian missionaries to distribute literature on the public sidewalks and in the public areas adjacent to the Arab Festival, including the public sidewalks adjacent to Warren Avenue and Miller Road and the public places located in the outer perimeter, Defendants had no basis for believing or concluding that Plaintiffs' presence on the public sidewalks adjacent to the Arab Festival for the purpose of

handing out religious materials and discussing their Christian faith posed any public safety, crowd control, or security risks to justify restricting Plaintiffs' expressive activity.

145.    The public interest would have been best served by granting Plaintiffs free access to the public sidewalks adjacent to Warren Avenue and Miller Road and the public areas located in the outer perimeter so that Plaintiffs and those with whom they associate could have exercised their fundamental constitutional rights, including their right to distribute religious literature in public forums such as sidewalks and streets.

146.    The Literature Distribution Restriction was selectively enforced during the 2010 Arab Festival.  Persons whose speech and activities Defendants favored and approved of were permitted to violate this rule.  However, persons whose speech and activities Defendants disfavored or disapproved of, such as the speech and activities of Plaintiffs, were subject to detention and arrest for distributing their religious literature at the festival.

147.    For example, Muslims were routinely allowed to distribute their religious literature outside of a booth without being harassed, stopped, detained, or arrested by Defendant police officers or festival workers.  Josh McDowell—who received preferential treatment by Defendants because of his favorable public comments about Defendants City, O'Reilly, Haddad, and the Arab Festival—and those with whom McDowell associated were permitted to circumvent the Literature Distribution Restriction by distributing written materials outside of their booth without being harassed, stopped, detained, or arrested by Defendant police officers or festival workers.

148.    Other festival rules have been and continue to be selectively enforced in favor of Muslims.  For example, in 2009, there was a festival rule that prohibited the distribution of "political literature or paraphernalia . . . inside anywhere on festival grounds."  However,

35

Muslims were permitted to distribute "Piss on Israel" and "Free Palestine" t-shirts at the festival. A true and accurate photograph of the distribution of political paraphernalia at a Muslim booth at the 2009 Arab Festival is attached to this Complaint as Exhibit 7.

149.   In 2010, festival rules prohibited political advertising or political solicitations of "any kind . . . on the Festival grounds."  However, during the festival, Muslims were permitted to engage in these political activities.  For example, at the 2010 Arab Festival, as in prior years, the Palestine Cultural Office ("PCO"), an organization that, among other things, solicits funds to promote its objective of "imparting information and critical analyses regarding the Israeli Occupation and other aspects of Palestinian rights" was permitted to have a booth to engage in its political activities.  According to PCO, it "[p]articipate[s] annually in the Dearborn Arab International Festival, handing out 'Free Palestine' balloons and t-shirts."

150.   While the festival rules and regulations, including the Literature Distribution Restriction, are not enacted by the City Council or any other legislative body and thus do not carry with them the force of law, the City, through its police officers, including Defendant Haddad and Defendant police officers, subjects violators of these rules and regulations to detention and arrest.  Consequently, as a matter of policy, practice, custom, and/or procedure, the City enforces the Arab Festival rules, regulations, and restrictions, including the Literature Distribution Restriction, as if they did carry with them the force of law.

151.   With regard to the enforcement of the Literature Distribution Restriction during the 2010 Arab Festival, Defendants, including the City, Defendant police officers, Beydoun, and Haidous, put in place a policy, practice, and/or procedure whereby violators of this restriction would be seized and interrogated by City police officers, hauled to the police command trailer,

forced to produce identification, and photographed, all without the person's consent (hereinafter "**Arrest Policy**").

152.    The persons who were seized by City police officers, including Defendant police officers, pursuant to the Arrest Policy were not free to leave and were forced to surrender their liberty to the authority of the police even though the detained persons committed no criminal offense.   The photographs and other information gathered pursuant to the Arrest Policy are maintained in the official police files of the City and its police department.

**F.    Plaintiffs Arrive at the 2010 Arab Festival in Peace and Leave in Handcuffs.**

153.    On Friday, June 18, 2010, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel arrived at the Arab Festival at approximately 7:00 p.m.  Plaintiff Qureshi was wearing a t-shirt with the slogan, "Jesus Always Loves You."

154.    Upon their arrival, many people at the festival, including workers, volunteers, security personnel, and City police officers, recognized Plaintiffs Qureshi and Wood from the 2009 YouTube videos.

155.    Prior to Plaintiffs' arrival at the 2010 festival and unbeknown to Plaintiffs, Defendants had allegedly received "tips," which were false, that Plaintiffs Acts 17, Qureshi, and Wood were planning a "festival invasion."  These false "tips" coupled with Defendants' existing animosity toward Plaintiffs as a result of the 2009 YouTube videos made Plaintiffs a primary target for selective enforcement action and adverse treatment by Defendants.

156.    Plaintiffs Qureshi, Wood, Rezkalla, and Mayel brought three small, personal, handheld video cameras with them to the 2010 Arab Festival to document their missionary activities, including their own running dialogue about their faith and discussions they might have with other festival goers about Christianity, and to document the general atmosphere of the

festival for Christians. This video footage would be used for journalistic as well as religious purposes. Plaintiffs also brought the cameras to record and document their actions so as to protect themselves from any harassment, false claims, false complaints, or false arrests.

157. The principal speaker for Plaintiffs was Plaintiff Qureshi, who carried a handheld microphone. The microphone did not amplify sound. Instead, it improved the sound quality for the recording of the primary camera, which was carried by Plaintiff Rezkalla.

158. Plaintiff Wood carried a second camera that he would use at times to take panoramic videos and to capture conversations and events from a different angle and perspective.

159. Plaintiff Mayel carried a third camera that was used to take video from a distance so as to capture a broader view of the events and activities of Plaintiffs Qureshi, Wood, and Rezkalla. The third camera was also used to protect Plaintiffs Qureshi, Wood, Rezkalla, and Mayel from harassment and false claims and charges. Plaintiffs Qureshi and Wood learned this lesson from their experience at the 2009 Arab Festival.

160. Upon entering the festival grounds at approximately 7:00 pm on June 18, 2010, Plaintiffs Qureshi and Wood engaged in a dialogue, outlining their purposes for returning to the festival in 2010.

161. One reason for returning to the Arab Festival in 2010 was to document whether the City kept its promise to make the festival a safer place for Christian missionaries such as Plaintiffs. During this opening dialogue, Plaintiffs Qureshi and Wood peacefully discussed Christianity, Islam, and the festival in general.

162. Plaintiffs' opening dialogue was recorded by the camera carried by Plaintiff Rezkalla. A true and accurate photograph of Plaintiffs Qureshi and Wood engaging in their opening dialogue while entering the festival in 2010 is attached to this Complaint as Exhibit 8.

163.    During their visit to the 2010 Arab Festival, Plaintiffs only engaged in religious discussions with those persons who approached them so as to further prevent any false claims of "harassment."

164.    Not long after arriving, several Muslim youths recognized Plaintiff Qureshi from the 2009 YouTube videos and approached him on Warren Avenue to engage in a discussion about religion.  Before the dialogue could begin, a festival security guard broke up the discussion by ordering the Muslims to leave, thereby preventing Plaintiff Qureshi from expressing or discussing his religious beliefs.  Defendants' plan to target Plaintiffs for disfavored treatment at the 2010 Arab Festival and thus hinder their ability to express their religious beliefs was put in motion.

165.    While at the Arab Festival, festival workers, security personnel and City police officers observed Plaintiffs Qureshi, Wood, Rezkalla, and Mayel videotaping their discussions. At no time prior to their arrests by Defendant police officers were Plaintiffs Qureshi, Wood, Rezkalla, or Mayel told that they could not videotape, nor were they warned by any police officer that their activity was impermissible.

166.    On multiple occasions prior to their arrests, police officers, including Defendants Mrowka, Kapanowski, and Smith, observed Plaintiffs Qureshi, Wood, Rezkalla, and Mayel videotaping and engaging in their religious speech activity without warning them to stop.  True and accurate photographs of police officers observing Plaintiffs videotaping at the 2010 Arab Festival are attached to this Complaint as Exhibit 9.

167.    Defendants did not prevent Plaintiffs from engaging in their religious speech activity prior to their eventual and inevitable arrests because Defendants were waiting for a pretext to seize Plaintiffs Qureshi, Wood, Rezkalla, and Mayel.  This pretext would include false

complaints from festival workers and volunteers—complaints that Defendants knew were false. Defendants wanted to build a false case against Plaintiffs to create the impression that their arrests were legitimate.

168.    Defendants conspired amongst themselves and with other festival workers and volunteers and thereby worked jointly to falsely build a case to arrest Plaintiffs at the 2010 Arab Festival in retaliation for Plaintiffs' religious speech activity, including Plaintiffs' publication and dissemination of the 2009 YouTube videos.

169.    At approximately 8:00 p.m., Plaintiffs Qureshi, Wood, and Rezkalla walked through one of the festival tents.  Plaintiff Qureshi was stopped briefly by several Muslim youths who wanted to ask him some questions.  The discussion was brief and did not block any pedestrian traffic, nor did it cause any disruption.

170.    While Plaintiffs were inside the tent, several festival workers, volunteers, and security personnel, including Defendant Haidous, were conspiring to get Plaintiffs Qureshi, Wood, Rezkalla, and Mayel removed from the festival.  A true and accurate photograph of Defendant Haidous conspiring with security personnel is attached to this Complaint as Exhibit 10.

171.    While Plaintiffs were inside the tent, festival workers, volunteers, and security personnel were heard making statements into their security radios that they "need to get rid of these guys," or words to that effect, referring to Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, and falsely claiming that these Plaintiffs were "harassing people," or words to that effect.

172.    These comments were overheard by George Saieg and Charles Neusch, among others.  Saieg is a Christian who traveled from California to attend the Arab Festival to evangelize Muslims, and Neusch, who accompanied Saieg at the festival, is a veteran police

40

officer with the New York City Police Department.  Saieg and Neusch could observe Plaintiffs Qureshi, Wood, Rezkalla, and Mayel while these comments were being made, and it was evident to them that Plaintiffs were not harassing anyone, nor were they making any trouble or causing any disturbance.

173.    After hearing these false comments and complaints and observing the festival workers, volunteers, and security personnel, Saieg and Neusch were concerned for the safety of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel so they called Defendant Mrowka on his cell phone and asked to speak with him about the matter.  Defendant Mrowka, who was accompanied by Defendants Kapanowski and Smith, came to the tent to speak with Saieg about the false complaints.  During the festival, Defendant Smith, who was in training, "shadowed" Defendant Kapanowski.

174.    When Saieg expressed his concerns and explained what he and Neusch had heard to Defendant Mrowka, Defendant Mrowka became angry and dismissed their concerns, taking no further action even though the offending festival workers, volunteers, and security personnel, including Defendant Haidous, were present with him in the tent.

175.    Upon receiving this complaint from Saieg, Defendants Mrowka, Kapanowski, Smith, and thus the City Police Department, were on notice that festival workers, volunteers, and security personnel were conspiring and planning to make false complaints as a pretext to have these Plaintiffs removed from the festival for expressing their religious beliefs.

176.    In fact, based on the 2009 incident involving Plaintiff Qureshi, Plaintiff Wood, and Sharp and the video produced as a result—a video that Defendant Mrowka saw prior to the 2010 Arab Festival—Defendant Mrowka knew that festival workers, volunteers, and security personnel had conspired and lied in the past to get these Christians removed from the festival.

177.    Defendant Mrowka did nothing about these new false claims, including documenting them in his official police reports, because he and the other Defendant police officers were cooperating with the festival organizers, workers, volunteers, and security personnel to target Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for adverse treatment.

178.    While Saieg was talking with Defendant Mrowka, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel continued to peacefully walk through the festival.  They had been at the festival for over an hour and wanted to purchase something to eat, so they walked toward the western end of Warren Avenue where the food vendors' tents were located.

179.    On their way to the food vending area, Plaintiff Qureshi was approached by a young Christian named Luke Campbell.  Plaintiffs had never met Campbell prior to this meeting.  Campbell told Plaintiff Qureshi that he was stopped by a festival worker and then detained by City police officers for handing out a Bible tract at the festival.

180.    Plaintiff Qureshi asked Campbell if he would be willing to do an interview on video to explain what had happened.  Campbell said he would, so Plaintiff Qureshi conducted the interview.  A true and accurate photograph of Plaintiff Qureshi interviewing Campbell at the 2010 Arab Festival is attached to this Complaint as Exhibit 11.

181.    During the interview with Campbell, Plaintiff Qureshi showed on video the way in which Defendants were selectively enforcing the Literature Distribution Restriction.  Christians, such as Campbell, were stopped and detained for distributing Christian literature pursuant to the Arrest Policy.  However, a Muslim standing a few feet from Plaintiff Qureshi and Campbell was permitted to distribute his literature without being subjected to harassment or detention by festival workers, volunteers, or City police officers, even though festival volunteers and workers walked directly past the Muslim, who was in full view.  A true and accurate

42

photograph of the Muslim distributing literature at the 2010 Arab Festival during the interview is attached to this Complaint as Exhibit 12.

182.   Shortly after concluding the formal part of the interview and while Plaintiff Qureshi was still talking with Campbell, Roger Williams, the festival worker who previously stopped Campbell and prevented him from handing out his Bible tracts, interrupted the conversation and stated, "I knew you were with them," or words to that effect, accusing Plaintiff Qureshi of being with Campbell and implying that Plaintiffs were also violating the Literature Distribution Restriction.  This false accusation was part of the plan to build a false case against Plaintiffs.

183.   Earlier in the day, Williams had crept up behind Plaintiff Mayel while she was videotaping and whispered in her ear, "I know who you are with," or words to that effect.

184.   Prior to interrupting Plaintiff Qureshi's conversation with Campbell, Williams and other festival volunteers walked right past the Muslim who, in plain view, was handing out literature on the street in violation of the Literature Distribution Restriction.  Neither Williams nor any other festival worker or volunteer stopped the Muslim or requested that City police officers detain the Muslim violator pursuant to the Arrest Policy similar to how Campbell was stopped and detained.

185.   Following this incident with Williams, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel continued to walk toward the western end of the festival to find something to eat.

186.   After walking through the festival for several minutes, Plaintiff Qureshi noticed that Williams was talking once again with Campbell.  Plaintiff Qureshi approached Campbell and asked him if everything was alright and whether the festival workers were "messing" with him again.  Campbell responded that everything was fine; they were just having a friendly

conversation.  Upon hearing that everything was fine, Plaintiff Qureshi turned and started to walk away.  As soon as he did, Williams shouted out to Plaintiff Qureshi, "You don't have to worry about me messing with him, you have to worry about me messing with you, all right," thus admitting that there was a plan to "mess with" Plaintiffs at the festival.

187.    Upon hearing this threat from the festival worker, Plaintiffs Qureshi and Wood stopped, turned back, and asked Williams why he was threatening them.  They wanted to know what, if anything, they were doing wrong.  Williams responded by stating that they were now complaining, to which Plaintiff Wood responded, "Complaining to who?  Is complaining illegal?  I'm not even complaining."  Williams proceeded to call security.

188.    Upon hearing Williams call for security, Plaintiff Qureshi responded, "Okay, so apparently we're doing something illegal.  I'm waiting to hear what it is exactly."  Williams stated, "Nobody said you did anything illegal," yet he continued to call security.

189.    Williams was creating the pretext to target these Plaintiffs for adverse action as Defendants had planned.

190.    On several occasions during this brief conversation, Williams walked away from Plaintiffs and then returned again to confront them.

191.    Still curious as to why he was calling security, Plaintiff Qureshi asked again for an explanation.  Williams stated that if they turn the camera off, he would tell them.

192.    Pursuant to Williams' request, Plaintiff Rezkalla turned the camera away and stood to the side with Plaintiff Wood while Plaintiff Qureshi approached Williams for the explanation.  Williams raised his hand to Plaintiff Qureshi and walked away without explaining.

193.    This brief conversation, which was captured on video, took place in the middle of Warren Avenue.  While Plaintiffs Qureshi and Wood were talking with Williams, festival goers

44

were walking by without paying any attention.  This innocuous conversation, which lasted approximately 2 minutes, caused no noise, disturbance, trouble, or disruption of any kind.

194.    At no time during this conversation did Plaintiffs threaten Williams, use force against Williams, or even raise their voices to Williams.  Williams was always free to walk away, as he did on several occasions.  But for Williams' threat to "mess with" Plaintiffs Qureshi, Wood, and Rezkalla, the conversation would not have taken place.

195.    Williams' threat to "mess with" Plaintiffs Qureshi, Wood, Rezkalla, and Mayel was part of and consistent with Defendants' concerted plan and conspiracy to target these Plaintiffs for adverse and discriminatory treatment at the 2010 Arab Festival.

196.    While this conversation with Williams was taking place in the middle of Warren Avenue, Plaintiff Mayel was across the street, standing behind the vending tents, videotaping. Due to her distance from Williams and the loud volume of the festival music, Plaintiff Mayel could not hear anything that was said during the conversation.  In fact, the encounter with Williams was so brief and uneventful, Plaintiff Mayel had no indication whatsoever that Williams was planning to make a complaint to Defendants Mrowka and Kapanowski based on this conversation.

197.    After Williams walked away, having refused to explain to Plaintiff Qureshi why he was calling security, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel continued to walk through the festival.

198.    Plaintiff Qureshi finally had an opportunity to get something to eat, so he went to a food vendor and purchased two falafel sandwiches.

199.    While Plaintiff Qureshi was purchasing his food, Williams, along with other festival workers, volunteers, and security personnel, including Amal Alslami, approached

Plaintiffs Wood, Rezkalla, and Mayel and took their pictures with several cameras.  Williams and Alslami then jumped into a golf cart and sped off to the police command trailer.

200.    Plaintiffs Qureshi, Wood, Rezkalla, and Mayel were not sure why all of these festival workers and volunteers were gathering around them and taking their pictures in the middle of the festival.  This impromptu photo session was all very strange and harassing to Plaintiffs, but it was consistent with and part of Defendants' plan to target Plaintiffs for adverse treatment.

201.    At this point, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel decided to leave the festival, so they started their walk toward the east end of Warren Avenue, where their car was waiting.  It was almost 9:00 p.m., and Plaintiffs had been at the festival for approximately two hours.

202.    While Plaintiffs Qureshi, Wood, Rezkalla, and Mayel were making their way out of the festival, Williams and Alslami went to the police command trailer.  Once arriving at the trailer, Williams spoke with Defendants Mrowka and Kapanowski.  According to the police reports written by Defendants Mrowka and Kapanowski, Williams told Defendant police officers that he felt uncomfortable as a result of the brief conversation he had with Plaintiffs Qureshi, Wood, and Rezkalla, and that during this conversation he did not feel that he was free to leave. Williams' report to the police was false and misleading.  Williams has never been charged with providing a false report to the police because Defendants knew that his report was false and misleading prior to arresting Plaintiffs.

203.    In the police reports prepared by Defendants Mrowka and Kapanowski, Defendants claimed that Alslami witnessed the conversation between Plaintiffs and Williams.

However, during a later interview conducted by Michael Sabo, a City police officer who was not involved in the arrests of Plaintiffs, Alslami confirmed that she did not witness the event.

204.    According to the police report prepared by Officer Sabo, "Amal [Alslami] stated she didn't see any of the confrontation between Williams and the four subjects arrested." Consequently, the police reports prepared by Defendants Mrowka and Kapanowski were false and misleading as to this fact.

205.    With regard to Plaintiff Mayel, Williams told Defendants Mrowka and Kapanowski that "he noticed Mayel still filming within hearing distance." Williams did not accuse her of doing anything more, and it is not a crime to videotape a person in public, even if the person does not want to be videotaped.

206.    Based on the information they had, Defendants Mrowka and Kapanowski knew that none of the Plaintiffs, specifically including Plaintiff Mayel, had committed any criminal offense.

207.    Knowing that no crime had been committed, Defendant Mrowka instructed Defendants Kapanowski and Smith to "investigate" the accusations; he did not yet direct anyone to be arrested. Defendants needed more pretext.

208.    Having no idea that Williams had made a complaint to the police officers, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel continued to make their way out of the festival. Plaintiff Mayel continued to maintain her distance from the other Plaintiffs while she was videotaping them with her camera.

209.    While Plaintiffs Qureshi, Wood, and Rezkalla were walking through a festival tent on their way out, Plaintiff Mayel was outside the tent recording them on her video camera. Defendant Kapanowski, Defendant Smith, Williams, Alslami, and an unknown festival worker

approached Plaintiff Mayel from behind and made contact with her.  Plaintiff Mayel was startled by the way they approached and surprised her, and she was frightened and intimidated by the number of people involved.

210.    Neither Defendant Kapanowski nor Defendant Smith had probable cause to believe that Plaintiff Mayel was involved in any criminal activity.  In fact, neither Defendant Kapanowski nor Defendant Smith had any basis for believing that Plaintiff Mayel had committed, was committing, or was about to commit a crime.  Plaintiff Mayel was peacefully engaging in constitutionally protected activity: she was videotaping pursuant to her rights protected by the First Amendment.

211.    Despite having no lawful authority to interfere with Plaintiff Mayel, Defendant Kapanowski ordered Plaintiff Mayel to stop videotaping, to remain with him, and to respond to his interrogation.  Plaintiff Mayel asked Defendant Kapanowski what the basis was for detaining her, and he said that he would tell her.  Plaintiff Mayel then asked, "Can you give me a second," to which Defendant Kapanowski curtly responded, "No," and proceeded to forcefully grab Plaintiff Mayel's arm.  Plaintiff Mayel protested, telling Defendant Kapanowski on several occasions to stop touching her.  Defendant Kapanowski then forcefully grabbed and seized Plaintiff Mayel's video camera, against her protest, and put it on a table.  The camera was later retrieved by Defendant Smith.  Because of Defendant Kapanowski's forceful actions, which included the seizure of Plaintiff Mayel and her property, his show of authority, his verbal responses, and the intimidating presence of Defendant Smith and the other festival workers, Plaintiff Mayel was not free to leave and was forced to remain with the police officers and answer their questions.  Indeed, Defendant Kapanowski admitted at Plaintiff Mayel's criminal trial that she was not free to leave.

212.     Defendant Kapanowski knew that he lacked probable cause to detain and interrogate Plaintiff Mayel because she never engaged in any criminal behavior.  During the interrogation, Defendant Kapanowski explained to Plaintiff Mayel that the criminal complaint against her was that Williams had asked her not to videotape him in public, to which Plaintiff Mayel accurately responded that he had never told her to stop videotaping.  Defendant Kapanowski responded, "Well, he did, so that's the criminal complaint."

213.     After being questioned outside of the tent, Defendants Kapanowski and Smith ordered Plaintiff Mayel to accompany them to the police command trailer.  Along the way, Plaintiff Mayel began to cry because she was physically and emotionally upset by the actions of Defendants Kapanowski and Smith.

214.     Defendants Mrowka, Kapanowski, and Smith locked Plaintiff Mayel in the police command trailer, which was hot and uncomfortable, while they went back to the festival to arrest Plaintiffs Qureshi, Wood, and Rezkalla.

215.     Defendants Mrowka, Kapanowski, and Smith, along with festival workers, volunteers, and security guards, conspired to arrest Plaintiff Mayel first because her camera was capturing a broader view of the activities of her fellow missionaries and would thus capture more details of the unlawful arrests of Plaintiffs Qureshi, Wood, and Rezkalla that would soon take place.  Indeed, during the criminal trial of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, Defendant Kapanowski used this fact to make the false claim that the videos of the unlawful arrests recorded by the cameras used by Plaintiffs Wood and Rezkalla were inaccurate, testifying that "[t]he videos were almost similar to when you're a kid looking through a cardboard, towel roll, not seeing the surrounding area."

216.     At the time of her arrest, Plaintiff Mayel was participating in constitutionally protected activity.  Defendants' actions injured her in a way likely to chill a person of ordinary firmness from further participation in that activity, and her constitutionally protected activity motivated Defendants' adverse actions.  That is, Defendants acted with a retaliatory intent or motive.

217.     While Defendants Kapanowski and Smith were depriving Plaintiff Mayel of her fundamental constitutional rights, Plaintiffs Qureshi, Wood, and Rezkalla continued to walk through the tent unaware of what was happening to Plaintiff Mayel.  In fact, Plaintiffs Qureshi, Wood, and Rezkalla were inside the tent talking to a woman vendor who was handing out raffle tickets for an "iPad computer."  There was no crowd in the tent; nor was there a crowd gathering anywhere near Plaintiff Mayel.

218.     In his official police report, Defendant Kapanowski knowingly and intentionally made material false representations about the incident with Plaintiff Mayel, claiming that she was "filming a large crowd in the far west tent.  Qureshi, Wood, and Rezkalla were inside the crowd" and that "fearing she may incite a riot, I removed the camcorder from her hand and escorted Mayel from the inside of the tent and away from the crowd."  There was no crowd in the far west tent, Plaintiffs Qureshi, Wood, and Rezkalla were not inside a crowd—they were talking to a vendor about a raffle ticket—and there was no basis to claim that Plaintiff Mayel "may incite a riot."

219.     Shortly after Plaintiff Mayel was hauled away to the police command trailer by Defendants Kapanowski and Smith, a young Muslim named Hakeem approached Plaintiff Qureshi while he was still inside the tent.  Hakeem recognized Plaintiff Qureshi from the 2009 YouTube videos.

50

220.    The initial contact with Hakeem inside the tent was brief.  However, as Plaintiffs Qureshi, Wood, and Rezkalla continued to walk toward the exit of the tent, Hakeem and several of his "bros" reengaged Plaintiffs in a conversation just outside of the tent.

221.    Prior to and during this conversation, Hakeem was at times using profanity, speaking loudly, and mocking Christianity.  Plaintiff Qureshi responded peacefully to Hakeem, answering his questions about Christianity and responding to his accusation that Plaintiff Qureshi hates Muslims.  Plaintiff Qureshi explained to Hakeem that he loves Muslims—he is of Arab descent, he was once a Muslim, and his family members are still Muslims.

222.    During the conversation, Hakeem was confrontational and at times shouted profanity at Plaintiffs Qureshi, Wood, and Rezkalla.  At no time did any City police officer stop, detain, or arrest Hakeem for raising his voice and shouting profanity at Plaintiffs, nor did any festival worker, volunteer, or security personnel make any complaints to the City police officers about this Muslim.  At no time did any City police officer arrest or charge Hakeem for violating the City's "breach of peace" ordinance, even though Hakeem's loud, profane, and boisterous conduct was causing a disturbance.  At all times, Plaintiff Qureshi peacefully responded to Hakeem, calming Hakeem's demeanor in the process.

223.    Defendant Ballard and other City police officers were observing this conversation between Plaintiff Qureshi and Hakeem.  Plaintiff Rezkalla and Wood were recording the conversation with their video cameras.  Despite Hakeem's occasional outbursts and use of profanity, the discussion ended with Plaintiff Qureshi and Hakeem shaking hands.  A true and accurate photograph of Plaintiff Qureshi shaking hands with Hakeem at the end of the discussion is attached to this Complaint as Exhibit 13.

224.    The conversation between Hakeem and Plaintiff Qureshi lasted approximately 5 minutes.   During this conversation, Plaintiff Qureshi did not cause any noise, disturbance, trouble, diversion, or riot that disturbed the peace in any way.  Instead, during this conversation Plaintiffs Qureshi, Wood, and Rezkalla were peacefully and lawfully exercising their fundamental constitutional rights.

225.    Shortly after this conversation with Hakeem ended, Plaintiff Wood, noticing that Defendant Ballard and other City police officers were standing nearby, asked Defendant Ballard, "Should we move over to the side?"  Defendant Ballard patted Plaintiff Wood on the shoulder and responded, "No, no, no, you're fine, just letting you know we're doing an evacuation here very shortly because of the weather though."  Plaintiff Wood responded, "Okay, yeah, we're heading out, we're heading out, we're on our way out."  Defendant Ballard again responded, "No, you're fine" and shook hands with Plaintiff Qureshi.  Plaintiff Wood concluded the conversation, stating, "Okay, thank you."

226.    Soon after this conversation with Defendant Ballard, a small group of Muslim youths approached Plaintiff Qureshi and started asking him questions about Christianity.  There were about 15 Muslims in this group, the conversation took place between two tents, and no one was blocking any pedestrian traffic as people were able to freely walk between the tents and on the City street.  The conversation was videotaped by Plaintiffs Rezkalla and Wood.

227.    This conversation with the small group of Muslims was civil and peaceful. Individuals involved in the conversation were taking turns asking Plaintiff Qureshi questions about religion, including Christianity and Islam.  No one was shouting, using profanity, or raising their voices.   Consequently, no one was causing any noise, disturbance, trouble, diversion, or riot that disturbed the peace in any way.

52

228.     About five minutes into this conversation, Defendants Kapanowski, Ballard, Smith, Micallef, Matteocci, and Fawaz descended upon Plaintiffs Qureshi, Wood, and Rezkalla, seized their video cameras and microphone, and placed them under arrest.   Defendants aggressively and forcefully placed Plaintiffs Qureshi, Wood, and Rezkalla in handcuffs, escorted them to the police command trailer, where they were detained for a period of time, then hauled them to the City jail, where they spent the night.   A true and accurate photograph of Defendants placing Plaintiff Qureshi in handcuffs at the 2010 Arab Festival is attached to this Complaint as Exhibit 14.

229.     Defendant police officers did not inform Plaintiffs Qureshi, Wood, or Rezkalla as to why they were being arrested until they were in a police van on the way to the City jail.

230.     While being escorted in handcuffs to the police command trailer, Muslim onlookers began to loudly cheer Defendants for arresting the Christian missionaries.   When one Christian onlooker verbally protested the injustice, one of the Defendant police officers stopped and ordered the Christian to keep quiet.   No Defendant told the Muslims to stop their loud cheering.

231.     While at the police command trailer, Defendant Mrowka told Plaintiffs Qureshi, Wood, and Rezkalla that Plaintiff Mayel was physically and emotionally distraught, upset, and crying.

232.     While at the police command trailer, Defendant Kapanowski, knowing that there was no basis for having arrested Plaintiff Mayel, stated, "That should be enough pain and suff[ering], we should release her right now.   She should be released. . . ."

233.     Defendant Kapanowski's admission was captured on a video camera that Defendant police officers seized from Plaintiff Wood, but failed to turn off.

234.    Defendant Kapanowski knew that he had caused Plaintiff Mayel "pain and suffering," and he caused this pain and suffering intentionally.

235.    While Plaintiff Mayel was detained in the police command trailer, Defendant Mrowka came to the door, held up a set of handcuffs, and told Plaintiff Mayel that it was time for her to go to jail, knowing that this would cause Plaintiff Mayel additional emotional distress. In fact, Defendant Mrowka's callous comment caused Plaintiff Mayel to cry even harder.

236.    Defendant Mrowka gave the order to place Plaintiff Mayel in handcuffs and take her to jail, which the officers did.  Plaintiff Mayel spent the night in the City jail.

237.    While in jail, Plaintiff Mayel was alone and frightened, not knowing what she had done or why she was in jail, causing further emotional distress.

238.    In his official police report documenting the arrest of Plaintiff Mayel, Defendant Kapanowski admits that the only information he had regarding Plaintiff Mayel's involvement in any alleged criminal activity prior to seizing her and her personal property was that Williams told him that "he noticed Mayel still filming within hearing distance."

239.    Defendant Kapanowski testified under oath during Plaintiff Mayel's criminal trial that the reason for detaining her and restricting her liberty was because she was allegedly "filming within hearing distance of the entire incident" with Williams.  Defendant Kapanowski further admitted under oath that it is not a crime "to film somebody within hearing distance at a public event."  Consequently, in a wanton, reckless, and callous disregard for Plaintiff Mayel's fundamental constitutional rights, Defendants Kapanowski, Mrowka, and Smith restrained Plaintiff Mayel's liberty, seized her person and property, ordered her to the command trailer, placed her in handcuffs, and hauled her to jail, where she spent the night in tears.

54

240.   The actions of Defendants Kapanowski and Mrowka, which were done with an evil motive and with a reckless and callous indifference to the federally protected rights of Plaintiff Mayel, caused Plaintiff Mayel physical and emotional distress and deprived her of her fundamental constitutional rights.

241.   The actions of Defendants Kapanowski, Ballard, Smith, Micallef, Matteocci, and Fawaz were done at the direction and with the approval of Defendants O'Reilly, Haddad, and Mrowka, they were done pursuant to the plan and agreement to retaliate against Plaintiffs for engaging in constitutionally protected speech, and they were done with an evil motive and with a reckless and callous indifference to the federally protected rights of Plaintiffs Qureshi, Wood, and Rezkalla, causing Plaintiffs physical and emotional distress and depriving them of their fundamental constitutional rights.

242.   At the time of their arrests, Plaintiffs Qureshi, Wood, and Rezkalla were peacefully and lawfully engaging in constitutionally protected activity.  Defendants' actions injured these Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity.  And Plaintiffs' constitutionally protected activity motivated Defendants' adverse action.  That is, Defendants acted with a retaliatory intent or motive.

243.   Upon the arrests of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, the City, through Defendant police officers, seized Plaintiffs' video cameras and video footage.  The video footage seized by the City and Defendant police officers contained material that is protected by the First Amendment.

244.   Shortly after the arrests of Plaintiffs Qureshi, Wood, and Rezkalla, and as they were being placed in a van to be transported to the City jail, Defendant Smith, who was with Defendant Kapanowski during the entire day, lectured Plaintiffs about the inappropriateness of

their speech.  Defendant Smith objected to Plaintiffs' religious speech, stating that Plaintiffs were supposed to be the "salt of the earth," but that they were being "too salty" based on his perception of the Muslim reaction to Plaintiffs' speech at the festival.  Defendant Smith stated that Plaintiffs were "driving Muslims away" as a result of their speech.

245.    All Defendants share a negative view toward the speech of Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel.  Defendants jointly and in agreement with one another conspired to target Plaintiffs for adverse and discriminatory treatment, which culminated in the arrests of Plaintiffs at the 2010 Arab Festival, because of Plaintiffs' speech.

246.    Defendants disfavor the way Plaintiffs proselytize because in addition to defending Christianity, Plaintiffs also criticize Islam, Mohammed, and the Quran and therefore pose a direct challenge and threat to Muslim beliefs.  In comparison, Defendants favor the religious speech of Christians, such as McDowell, who will not criticize Islam, Mohammed, or the Quran for fear that they might offend Muslims.  This latter approach poses no direct challenge or threat to Muslim beliefs and is therefore favored by Defendants.

247.    Defendants Kapanowski, Ballard, Smith, Micallef, Matteocci, and Fawaz made the decision to arrest Plaintiffs Qureshi, Wood, and Rezkalla at the 2010 Arab Festival based on Plaintiffs' constitutionally protected speech activity.

248.    Defendants Kapanowski, Ballard, Smith, Micallef, Matteocci, and Fawaz arrested Plaintiffs Qureshi, Wood, and Rezkalla at the 2010 Arab Festival based on the officers' perception that listeners, who were mostly Muslims, were reacting negatively to Plaintiffs' speech.

249.    The City, through its police department and Defendant Haddad, have in place a policy, practice, custom, and/or procedure that if a private person is speaking and a crowd reacts

negatively toward the speaker, City police officers are authorized to arrest the speaker (hereinafter "***Heckler's Veto Policy***").

250.    The City, through its police department and Defendant Haddad, train City police officers, including Defendant police officers, to enforce the Heckler's Veto Policy.  This training is done with a deliberate indifference as to its known or obvious consequences, and it was also a moving force behind the actions that deprived Plaintiffs of their fundamental constitutional rights as set forth in this Complaint.

251.    Defendant police officers arrested Plaintiffs Qureshi, Wood, Rezkalla, and Mayel at the Arab Festival on or about June 18, 2010, pursuant to the City's Heckler's Veto Policy.

252.    Defendants Haddad and Mrowka confirmed the existence of the Heckler's Veto Policy during their testimony at the criminal trial of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel.  Defendant Haddad further confirmed during his testimony that the Heckler's Veto Policy was the moving force behind the arrests of Plaintiffs.

253.    Defendants will enforce the City's Heckler's Veto Policy against Plaintiffs in the future and at future Arab Festivals.

254.    The arrests of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel at the 2010 Arab Festival were in retaliation for the speech, expressive religious activities, and expressive associations of Plaintiffs Acts 17, Qureshi, and Wood because Defendants believe that Plaintiffs' expressive activities and associations convey a negative message toward Islam, the Arab Festival, and the City.  In sum, Defendants punished Plaintiffs because of their speech, expressive religious activities, and expressive associations.

255.    In his official police report, Defendant Mrowka, jointly and in cooperation and agreement with Defendants Kapanowski, Ballard, Smith, Micallef, Matteocci, and Fawaz, made

false and material misrepresentations to cover up for the police misconduct and to provide a pretext for punishing Plaintiffs for their speech, expressive religious activities, and expressive associations.

256.    In his official report, Defendant Mrowka made false and material misrepresentations, including the following: "Negeen Mayel, Nabeel Qureshi, David Wood and Paul Rezkalla's actions caused a crowd to gather and become agitated.  The weather conditions, hot and humid temperatures, fueled an already agitated crowd.  This was evident by the crowds yelling profanities and repeated calls to security and police on the behavior of Mayel, Qureshi, Wood and Rezkalla.  When uniform officers were present Qureshi was yelling into the crowd further inciting the crowd.  Negeen Mayel had already failed to obey a police (sic) orders.  As a result of these behaviors all four subjects were handcuffed and detained."

257.    Plaintiffs Qureshi, Wood, Rezkalla, and Mayel did not cause a crowd to gather and become agitated.  There was no "agitated crowd" prior to the police arresting Plaintiffs and taking them away in handcuffs.  Plaintiff Qureshi was not yelling into the crowd.  And Plaintiff Mayel did not fail to obey any lawful order of a police officer.  Thus, Defendant Mrowka's official police report is materially false and misleading.

258.    Moreover, no member of the allegedly "agitated crowd," which was mostly Muslim and allegedly "yelling profanities" and engaging in "agitated" conduct, was arrested by City police officers.  Defendants targeted Plaintiffs Qureshi, Wood, and Rezkalla for adverse treatment, including arrest and seizure of their personal property, because of the content and viewpoint of Plaintiffs' speech and/or their association with Acts 17.

259.    Defendant Mrowka also states in his official police report that Plaintiffs Qureshi, Wood, and Rezkalla were arrested "to avoid a possible riotous crowd."  This statement was materially false and misleading.

260.    While Defendant Mrowka's official police report contains false and material misrepresentations, it unwittingly admits that Defendant police officers arrested Plaintiffs Qureshi, Wood, Rezkalla, and Mayel based on Defendant police officers' perception that the crowd was reacting negatively toward Plaintiffs' speech.  That is, these arrests were made pursuant to the City's Heckler's Veto Policy.  Thus, the City's Heckler's Veto Policy and the City's failure to adequately train its police officers were the moving forces behind the deprivation of Plaintiffs' fundamental constitutional rights.

261.    Defendant Kapanowski's official police report also contains materially false and misleading statements, including the following: that "Alslami stated she observed the above incident as Williams had recalled"; that when Defendant Kapanowski approached Plaintiff Mayel to seize her for questioning, she was "filming a large crowd in the in the (sic) far west tent"; that "Qureshi, Wood, and Rezkalla were inside the crowd"; that Plaintiff Mayel "began speaking very loudly in attempts to get the attention of the other subjects in the large crowd"; that "[s]he began to scream toward the crowd"; that her actions "may incite a riot"; that when he and the other Defendant police officers approached Plaintiffs Qureshi, Wood, and Rezkalla to arrest them, the officers "advised them to turn their camcorders off . . . [but Plaintiffs Wood and Rezkalla] were hesitant"; that "Wood even went as far as lifting the camcorder into the air in order to continue filming"; and that "Qureshi began screaming."

262.    Defendant police officers had no desire to investigate the truth of Williams' allegations, which were absurd on their face.  Rather, Defendants only objective was to punish

Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for their religious speech activities by arresting them, handcuffing them, publicly humiliating them, and sending them to jail.

263.   Upon being arrested, Plaintiffs Qureshi, Wood, and Rezkalla asked Defendants Mrowka and Kapanowski to take just five minutes to view the video footage on their cameras. This video footage contained irrefutable evidence that Plaintiffs did not cause a breach of the peace and were in fact innocent of any such offense.  Defendants refused to view the exculpatory evidence.  Instead, Defendants preferred that Plaintiffs spend the night in jail.

264.   Rather than spend five minutes to review the exculpatory evidence, Defendant Mrowka tied up two police vans and four police officers to take Plaintiffs Qureshi, Wood, Rezkalla, and Mayel to the City jail.  Defendant Mrowka chose to expend all of these police resources on the four Christian missionaries even though Defendants were closing down the festival early due to a pending storm and would need all available police officers to help with evacuating the crowd.  Defendants' willingness to sacrifice public safety in order to punish Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for exercising their fundamental constitutional rights is further evidence of Defendants' illicit plan and motive to target Plaintiffs for adverse and discriminatory treatment.

265.   During the "booking" at the City jail, a sympathetic City police officer told Plaintiffs Qureshi and Rezkalla that some of the police officers were "on their side," "agreed with what they were doing," and "didn't think they did anything wrong," or words to that effect, demonstrating further that Defendants retaliated against Plaintiffs for their religious speech activity.

266.   The sympathetic police officer told Plaintiffs that the security personnel hired for the Arab Festival were mostly "criminals and gang members."

267.    The sympathetic police officer told Plaintiffs that there were instances in the City where "honor killings" permitted by sharia law had taken place, but they were covered up.

268.    Plaintiffs Qureshi, Wood, and Rezkalla were released from the City jail the following day, June 19, 2010, on $500 bail each.

269.    Plaintiff Mayel was released from the City jail the following day, June 19, 2010, on $1,000 bail.

270.    Plaintiffs Qureshi, Wood, Rezkalla, and Mayel were criminally charged with violating Section 14-131 ("breach of peace") of the City's Code of Ordinances.  Plaintiff Mayel was additionally charged with "failure to obey" an order of a police officer under Section 14-38.1 of the City's Code of Ordinances.

**G.    City Police Officers Seize Plaintiffs for Distributing the Gospel on Sunday, June 20, 2010.**

271.    On Sunday, June 20, 2010, Plaintiffs Wood, Rezkalla, and Hogg went to the Warren Avenue area to distribute religious literature.  Plaintiffs stood on the public sidewalk outside of the Arab Festival boundaries, which were marked by physical barriers.   After Defendant police officers arrested Plaintiffs Qureshi, Wood, Rezkalla, and Mayel on Friday, June 18, 2010, Plaintiffs feared that if they went into the festival they would be falsely arrested once again.

272.    While Plaintiff Mayel returned on June 20th to Warren Avenue with Plaintiffs Rezkalla and Wood, she was so traumatized by her arrest two days prior and frightened by the thought of being arrested again that it was decided that she not take part in any religious activities near the festival.  Instead, Plaintiff Mayel sat inside a local drugstore while her fellow missionaries went to distribute Christian materials outside of the festival.

273.    Plaintiff Hogg accompanied Plaintiffs Rezkalla and Wood primarily to obtain video footage of Plaintiffs' activities.  This footage would be used for television broadcasting and for ministry purposes.

274.    Upon arriving at the festival boundary, Plaintiff Wood realized that, based on his arrest two days prior and the YouTube videos he appeared in after the 2009 Arab Festival, City police officers might deliberately target him again and stop him from distributing copies of the Gospel.  Consequently, Plaintiff Wood asked Plaintiff Hogg to trade roles in an effort to protect the group from retaliation by City police officers and festival security guards.

275.    Shortly after arriving at their destination on Warren Avenue, Plaintiffs Rezkalla and Hogg began distributing copies of the Gospel of John written in English and Arabic on the public sidewalk outside of the festival boundaries.  Plaintiff Wood, who was not distributing any materials, was standing back on the sidewalk with his video camera, recording his fellow missionaries.

276.    Unbeknown to Plaintiffs Wood, Rezkalla, and Hogg, the public sidewalk where they were distributing their religious literature was in the outer perimeter—an area that is open to all pedestrian traffic and where no festival activities take place.  There were no markings indicting that the location was within the outer perimeter.

277.    There were very few people on the public sidewalks in the outer perimeter, and Plaintiffs Rezkalla and Hogg were standing at a location on the sidewalk that did not block or impede pedestrian traffic in any way.  A true and accurate photograph of Plaintiffs distributing their religious literature at this location on June 20, 2010, is attached to this Complaint as Exhibit 15.

278.     Plaintiffs Rezkalla and Hogg were distributing their religious literature for just a few minutes when eight City police officers, which included Defendant Gafford and Defendant John Doe Police Officers 1 through 7, suddenly appeared.  Pursuant to the Arrest Policy, Defendant police officers stopped Plaintiffs Rezkalla and Hogg from distributing their literature and seized them under color of authority without Plaintiffs' consent even though Plaintiffs had committed no crime.  As a result of the seizure, Plaintiffs Rezkalla and Hogg were not free to leave.  A true and accurate photograph of the eight Defendant police officers seizing Plaintiffs Rezkalla and Hogg is attached to this Complaint as Exhibit 16.

279.     Defendant Gafford approached Plaintiff Wood and seized him and the video camera he was holding pursuant to the Arrest Policy even though Plaintiff Wood was not distributing literature nor was he engaged in any criminal activity.  Instead, Plaintiff Wood was engaged in activity protected by the First Amendment.

280.     Defendant Gafford's acts of grabbing Plaintiff Wood and the video camera he was holding were done without lawful authority.

281.     Defendant police officers targeted Plaintiff Wood for retaliation, confirming his suspicion.

282.     Plaintiff Wood was frightened and intimidated by Defendant police officers, as demonstrated by the video he was shooting, which shows his camera hand shaking uncontrollably while videotaping the police officers surrounding his fellow Christians.

283.     Pursuant to the Arrest Policy, Plaintiffs Rezkalla, Hogg, and Wood were forced to accompany Defendant police officers to the command trailer (which brought them into the festival), where the officers seized Plaintiffs' identifications, interrogated them, admonished them, lectured them about festival rules and regulations, ordered them to cease their non-

obstructive, peaceful free speech activity, which consisted of distributing copies of the Gospel of John on the public sidewalks adjacent to the festival and in the outer perimeter, and photographed them, all without Plaintiffs' consent.  This unlawful seizure lasted approximately 30 minutes.

284.    During their seizure, Plaintiffs Rezkalla, Hogg, and Wood were not free to leave. In fact, Defendant Gafford had seized Plaintiff Wood's camera, requiring Plaintiff Wood to accompany him to the police command trailer in order to recover his personal property, which was expensive and contained video footage that he intended to use as part of his Christian missionary and journalistic work.  Moreover, Plaintiffs Wood, Rezkalla, and Hogg knew that Plaintiff Mayel had been arrested, charged, and thrown in jail for not immediately obeying the unlawful order of Defendant Kapanowski.  Therefore, when Plaintiffs were surrounded and ordered to accompany Defendant police officers to the police command trailer, they understood that they had no choice but to comply with the unlawful order.

285.    Upon their release from the police command trailer, which was within the Arab Festival, Plaintiff Wood asked the City police officers if there were any restriction on videotaping at the festival, and they told him that there were no such restrictions.  Indeed, they did not tell him that he was required to go to the Free Speech Zone in order to videotape at the festival.

286.    Still confused as to why he had been arrested two days prior, Plaintiff Wood asked the City police officers where he could get a copy of the festival rules.  They directed him to the AACC booth.

287.    After being assured by City police officers that there were no restrictions on the use of video cameras at the Arab Festival, Plaintiffs Wood, Rezkalla, and Hogg briefly remained

within the festival to continue videotaping.  Plaintiff Wood went to the AACC booth and requested a copy of the festival rules, but was told that they didn't have any copies.

288.    Plaintiff Hogg videotaped Plaintiffs Rezkalla and Wood as they walked through the festival, stopping at times to have brief discussions with Muslims.  One teenage Muslim requested a copy of the Gospel of John from Plaintiffs, but Plaintiffs denied the Muslim's request out of fear of being arrested by City police officers for violating the Literature Distribution Restriction.  Plaintiffs feared that this was yet another attempt to entrap them.

289.    Shortly thereafter, Williams approached Plaintiffs and told them that they were not allowed at the festival.  He then ran to get the police and festival security.  Defendant Haidous also appeared and was watching Plaintiff Wood very closely.

290.    Moments later, while Plaintiff Hogg was videotaping, a golf cart occupied by a festival security guard whom Plaintiff Wood recognized from the 2009 YouTube video—he was in charge of security at the 2009 Arab Festival—drove past.  A true and accurate photograph of this festival security guard is attached to this Complaint as Exhibit 17.

291.    The festival security guard stopped his golf cart, stepped out, and approached Plaintiff Hogg in an intimidating manner.  The security guard complained to Plaintiff Hogg that he was videotaping his family, so he called the City police.

292.    Based on the festival security guard's complaint, Defendants John Doe Police Officers 8 and 9 arrived, detained Plaintiff Hogg, and demanded that he show them his video footage.  One of the officers stated, "I know what you are doing and why you are doing this," or words to that effect.  He then ordered Plaintiff Hogg to erase his footage, which Plaintiff Hogg did in the presence of the police officers.  Plaintiff Hogg did not want to erase his video footage, but he had no choice but to follow the officers' unlawful order and erase it.  Plaintiff Hogg knew

that Plaintiff Mayel had been arrested, charged, and thrown in jail for not immediately obeying the unlawful order of Defendant Kapanowski.

293.    Defendant John Doe Police Officers 8 and 9 had no lawful basis or authority to seize Plaintiff Hogg or his video camera, nor did they have probable cause or any other lawful authority to order Plaintiff Hogg to erase his video footage.

294.    When Plaintiff Wood learned that City police officers had ordered Plaintiff Hogg to erase his video footage, that he and his fellow Christian missionaries would no longer be protected by video evidence, that festival workers and security guards were again targeting them, and that City police officers were again acting as the "muscle" for the security guards, he knew that he and his fellow Christians were in immediate danger of assault or arrest, and he told everyone in his group to leave the festival without delay, which they did.

**H.    Defendants Hold Plaintiffs' Video Footage to Hinder Plaintiffs' Ability to Defend Themselves in Public Against False and Defamatory Attacks by Defendants City and O'Reilly.**

295.    The City, through Defendant police officers, seized Plaintiffs' video cameras and video footage on Friday, June 18, 2010.

296.    Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, through counsel, demanded the return of their video cameras and video footage on Monday, June 21, 2010, via a letter that was sent to Defendant Haddad via facsimile and U.S. Mail.  A copy of the letter was also sent to the City's corporation counsel.

297.    Defendants made a copy of Plaintiffs' video footage on or about June 22, 2010, pursuant to a warrant issued on June 21, 2010, by Judge Mark Somers of the 19th District Court based on the claim that the footage contained evidence of a crime.

298.   On or about June 22, 2010, Detective Sabo reviewed the video footage, which showed that Plaintiffs did not "breach the peace" in violation of the City Code of Ordinances. The video footage provided irrefutable evidence that Plaintiffs did not engage in any criminal activity.  Consequently, Defendants had no lawful basis for prosecuting Plaintiffs for breaching the peace at the 2010 Arab Festival.

299.   The City and Defendant police officers did not return Plaintiffs' video cameras and video footage until July 14, 2010, which was more than 3 weeks after Defendants obtained their own copy of the video footage and more than 3 weeks after Plaintiffs' written demand for the immediate return of their seized property.

300.   During the 3 weeks in which Plaintiffs were denied access to their exculpatory video footage, the City, through Defendant O'Reilly, made false and defamatory public statements designed to injure the reputation of Plaintiffs and to prejudice potential jurors against them in their pending criminal trial arising out of their unlawful arrests at the Arab Festival on June 18, 2010.  Defendants City and O'Reilly knew the statements were false, or they acted with a reckless disregard for the truth.

301.   Plaintiffs were unable to adequately respond to the false claims made by Defendants City and O'Reilly because the City, through its police department, including Defendant police officers, would not return Plaintiffs' video cameras and video footage. Defendants City and O'Reilly, through the City Police Department and Defendant police officers, were aware of this fact and exploited it.

302.   In the affidavit prepared by Detective Sabo to support the City and Defendant police officers' request to get a search warrant to copy Plaintiffs' video footage, Detective Sabo states the following (italics in the original):

Information was obtained that would indicate that the confiscated video cameras contained footage of the activities of the (4) individuals during their time at the Arab Festival on 6/18/10, including parts of their arrest by Dearborn Police. This information was obtained from the websites Acts17.net and answeringmuslims.com. In the latter website, all (4) individuals are on camera discussing the details of their arrest shortly after they all posted bond and were released. It's mentioned during the round table discussion that their activities that night (6/18/10) were captured on video. Also, Nabeel Qureshi wrote this on the answeringmuslims.com website: "*David and I, along with Negeen and Paul Rezkalla, were arrested and spent last night in jail. It is a long story which we will elaborate in full detail when we can, and will post footage when the police give us back our cameras.*"

In addition, Nabeel Qureshi wrote, "*Paul, David, Negeen, and I went to the festival to see and comment on the situation. Thankfully, we recorded every second of our activity at the festival.*"

303.     During the three weeks that the City and Defendant police officers retained control over Plaintiffs' video footage, Defendant O'Reilly held public, televised interviews in which he claimed to have seen the video footage and then falsely claimed that the footage shows that Plaintiffs committed the criminal offense of "breach of peace." These statements were false and defamatory in that they falsely asserted that Plaintiffs committed criminal offenses. Defendant O'Reilly knew his statements were false when he made them.

304.     In a public statement issued by Defendant O'Reilly in his official capacity as mayor of the City ("Mayor Statement") prior to the release of Plaintiffs' video footage and prior to the commencement of any hearing on the criminal charges against Plaintiffs, Defendant O'Reilly stated the following, in relevant part (emphasis added):

The City of Dearborn **has been under attack for several years by a group identifying themselves as Acts 17 Apologetics**. They arrive in Dearborn **with the intent to disrupt a local cultural festival and misrepresent facts in order to further their mission of raising funds through emotional response**. The funds they raise are then used to finance travel and cameras **to disrupt other events** in other cities.

* * * *

68

On Friday, June 18, they behaved very differently than what you saw on film from Saturday, June 19. They were not handing out flyers but were ***aggressively engaging passers-by in confrontational debate*** when they were arrested and cited for Breach of the Peace and Failure to Obey the Lawful Order of a Police Officer. See www.cityofdearborn.org for more details.

* * * *

At the time he was arrested on Friday, June 18, Mr. Wood had gathered a large crowd around him, blocking a key access point between the tents. The crowd was forced to grow bigger solely because people could not pass. ***Those who created this public danger did so with the knowledge that they were violating the laws because they wanted to be arrested while their cohorts were actively recording the event for posting on the web***. They knew that they could inflame the passions of viewers who would be ***taken in by their misrepresentation*** of what was really going on. They have even found media that would put them on air to repeat these inaccurate representations without seeking information or the truth from others.

It makes a good news story to say that a community is infringing on peoples' rights especially when it is couched in the true bias of generating negative feelings about another religion. ***The real violation of First Amendment rights occurs with Acts 17 Apologetics trying to imply they were the victim when the real violation is their attack on the City of Dearborn*** for having tolerance for all religions including believers in the Koran.

Dearborn is a true American City that welcomes everyone in the full spirit of our great constitution. We are a community of faith that is dedicated to the welfare of everyone whether resident or guest. These gross misrepresentations have caused us to come together in a stronger way.

Almost a year ago, ***after earlier attacks by Acts 17 Apologetics on Dearborn***, I hosted a meeting with the Dearborn Area Ministerial Association (DAMA), a group of mostly Christian religious leaders, but inclusive of all faiths in Dearborn. I asked them to review the video from the 2009 festival, examine the facts and measure the impact on our community. The discussion was frank and sincere.

After that meeting with DAMA, a separate group of Dearborn Christian evangelical ministers released a written criticism of the actions and misrepresentations of Acts 17 Apologetics. http://www.fairlanealliance.org/downloads/letter_concerning_acts_17.pdf

The truth is Christian evangelists are active at the Arab Festival. They participate ***in lawful ways***. While many are local, some, like world renowned minister and author Josh McDowell, come to the festival because it offers a large number of people who can be engaged in the message of the New Testament. He and the other evangelists ***followed the rules*** and have been successful in achieving their goals. Mr. McDowell posted positive recordings of his experience at the festival

in 2009 http://www.youtube.com/watch?v=cIH1F7KGWnY and 2010 http://www.youtube.com/watch?v=mzh3MYv1L4A. These videos provide a sharp contrast to the recordings of Acts 17 Apologetics and, better yet, **they have only truth as their motive**.

Dearborn is not your enemy nor are the people who live here. **People who would promote hatred and lies to get others to act in ways that are contrary to what America stands for are the real enemy for all lovers of our country**. History is full of **horrific events that were manufactured by lies to get good people to act purely emotionally to achieve the deceiver's ends**. We hope that you will choose to become informed and avoid being taken in by people that **have yet to share true faith with anyone in Dearborn**.

Sincerely,
Mayor John B. O'Reilly Jr.
City of Dearborn

305.    Defendant O'Reilly viewed the video footage of Plaintiffs' activity at the 2010 Arab Festival that was seized by Defendant police officers prior to drafting the Mayor Statement and/or while this statement was publicly posted on the City's official website. As a result, Defendants City and O'Reilly knew that the Mayor Statement contained false, misleading, and defamatory statements and information at the time it was published. Yet, Defendants City and O'Reilly continued to publish the statements with actual malice in that they knew the statements were false, or they acted with a reckless disregard for the truth.

306.    The Mayor Statement contains false and defamatory statements about Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel. The false statements are defamatory *per se* in that they accuse Plaintiffs of engaging in criminal behavior, they accuse Plaintiffs of fraud, and they accuse Plaintiffs of being the country's "real enemy," among other false accusations.

307.    The Mayor Statement was and continues to be posted on the City's official website.

308.    The City officially endorsed and promoted and continues to endorse and promote the content of the Mayor Statement.

70

309.    The Mayor Statement conveys an official message of disfavor of and hostility toward Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel and their religious message, expressive religious activities, and expressive associations and an official endorsement of other religious messages, expressive religious activities, and expressive associations.

310.    The Mayor Statement was issued shortly after the arrests of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel at the 2010 Arab Festival and before any hearing on the criminal proceedings that were initiated against these Plaintiffs.

311.    The Mayor Statement had the purpose and desired effect to negatively influence the criminal proceedings against Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, and deny these Plaintiffs a fair trial.

312.    The Mayor Statement had the purpose and desired effect of damaging the reputation of Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel.

313.    The Mayor Statement had the purpose and desired effect of negatively impacting the efficacy of the missionary efforts of Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel.

314.    The Mayor Statement has damaged the reputation of Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel, and it has negatively impacted the efficacy of the missionary efforts of Plaintiffs Acts 17, Qureshi, and Wood.  For instance, due to Defendants' false and defamatory statements, including but not limited to their statements that Plaintiffs broke the law, violated festival rules, refused to break up a disruptive dialogue, aggressively confronted passersby, caused a public safety threat by blocking a tent entrance, deceptively edited video footage, and covered up relevant facts in an effort to mislead viewers and "promote hatred and lies," many Christians and Muslims now regard Plaintiffs Acts 17, Qureshi, and Wood as troublemakers and criminals who should not be given a platform to speak.

315.    Since Defendants published the false, defamatory, and damaging Mayor Statement, Plaintiffs Acts 17, Qureshi, and Wood are rarely able to advertise their speaking engagements because as soon as the locations of their speaking engagements are known, the hosts receive numerous complaints and are asked to cancel the event.  Thus, as a result of Defendants' false and defamatory statements, Plaintiffs have been denied speaking engagements and other opportunities to promote their message and fund their ministry.

316.    The false and defamatory Mayor Statement is often used by Muslims and others to attack the reputation, character, and good will of Plaintiffs Acts 17, Qureshi, and Wood.

317.    The unlawful arrests of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel generated many complaints to the City.  Defendants City and O'Reilly deflected those complaints by sending the complainants a copy of the Mayor Statement or directing them to it on the City's website.  Consequently, Defendants City and O'Reilly were able to mislead the people who were most concerned about the unlawful arrests.  And since Plaintiffs Acts 17, Qureshi, and Wood did not have the complainants' contact information, or the video footage of their unlawful arrests, which Defendant police officers seized and had yet to return, Plaintiffs were powerless to defend themselves and their reputations to these people, most of whom lost their concern once they believed the false and defamatory Mayor Statement.

318.    While Plaintiffs were denied access to their personal property, including their video footage, which they wanted to publicly post, in part, to refute the false and defamatory public claims made against them by Defendants City and O'Reilly, Defendant O'Reilly was permitted to view the video footage, which Defendant police officers seized under the pretext that it contained evidence of criminal activity, even though Defendant O'Reilly is not a law enforcement officer or a prosecutor for the City.

319.   Defendant O'Reilly, as the chief executive officer for the City, is the immediate supervisor of Defendant Haddad and the immediate supervisor for the prosecutors for the City. Because of his personal animosity toward Plaintiffs Acts 17, Qureshi, and Wood and their expressive activities, Defendant O'Reilly pressured the City and Defendant police officers to maliciously prosecute Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for their actions at the 2010 Arab Festival.

320.   The prosecutions of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for allegedly causing a "breach of peace" were done with malice and in retaliation for Plaintiffs' speech activity and not for the purpose of bringing the alleged offenders to justice.

321.   Based in large part on the Mayor Statement, Defendants Haddad, Mrowka, and Kapanowski knew that Defendant O'Reilly wanted Plaintiffs Qureshi, Wood, Rezkalla, and Mayel to be prosecuted and convicted for allegedly breaching the peace at the 2010 Arab Festival.

322.   Plaintiffs' video footage seized by Defendant police officers and viewed by City officials, including, but not limited to Defendants O'Reilly, Haddad, Mrowka, and Kapanowski, prior to July 12, 2010, contained irrefutable evidence demonstrating that Plaintiffs Qureshi, Wood, Rezkalla, and Mayel did not engage in any conduct that could reasonably and objectively be construed as a breach of the peace.  Instead, the irrefutable video evidence shows that Plaintiffs were engaging in constitutionally protected speech activity before and at the time of their arrests.

323.   In an official memorandum prepared by Commander Jimmy Solomon of the City Police Department for Defendant Haddad and "Commander T. Teefey," entitled, "2010 Arabfest Video Review (Rpt#10-6183), dated "06/29/2010," Commander Solomon states, "Chief Haddad,

73

This memorandum is in regards to my review of the six discs of video that were given to me for review.  I have watched all of the videos and made the following notes . . . ."

324.    In this official memorandum prepared for Defendant Haddad, Commander Solomon finds no evidence of any criminal wrongdoing on the part of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, despite the fact that he had access to video footage that recorded every second of Plaintiffs' activities at the festival.   Indeed, Commander Solomon describes the conversation with Williams as a "[s]light confrontation."

**I.     Malicious Criminal Proceedings Instituted Against Plaintiffs Qureshi, Wood, Rezkalla, and Mayel.**

325.    The City arrested and charged Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for allegedly violating Section 14-131 ("breach of peace") of the City's Code of Ordinances during the 2010 Arab Festival.  Plaintiff Mayel was additionally charged with "failure to obey" an order of a police officer under Section 14-38.1 of the City's Code of Ordinances.  Both offenses are criminal misdemeanors.

326.    On July 12, 2010, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel were arraigned on the criminal charges in the District Court for the 19th Judicial District in Michigan.  Plaintiffs Qureshi, Wood, Rezkalla, and Mayel entered pleas of "not guilty."

327.    During the criminal trial of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, which commenced on September 20, 2010, and ended on September 24, 2010, Defendant Kapanowski presented false testimony against these Plaintiffs.

328.    During his testimony, Defendant Kapanowski stated he had not had any contact with Plaintiffs prior to arresting them at around 9 p.m. on June 18, 2010.  Video evidence showed that to be false.

329.     Defendant Kapanowski testified that Plaintiffs Qureshi, Wood, and Rezkalla had caused a crowd of over 50 people to gather prior to their arrests by City police officers.  Video evidence and other testimony showed that to be false.

330.     Defendant Kapanowski testified that when Defendant police officers approached Plaintiff Qureshi, took him a couple of steps away, and advised him he was under arrest, Plaintiff Qureshi began "screaming" to incite the crowd.  Video evidence and other testimony showed that to be false.

331.     Defendant Kapanowski testified that as Defendant police officers approached Plaintiffs Qureshi, Wood, and Rezkalla to arrest them, the crowd had become riotous.  Video evidence and other testimony showed that to be false.

332.     In fact, the crowd did not start to gather until Defendant police officers created a disturbance and diversion by showing up in force and illegally arresting Plaintiffs Qureshi, Wood, and Rezkalla.  Defendants' illegal arrests of Plaintiffs caused people to gather to watch what the police were doing.   And while Defendant police officers were hauling Plaintiffs Qureshi, Wood, and Rezkalla away in handcuffs, Muslim onlookers began cheering for the police.

333.     During sworn testimony at the criminal trial, Defendant Kapanowski admitted that the alleged conduct that served as the basis for initially detaining and then arresting Plaintiff Mayel was in fact not a crime.  Defendant Kapanowski thus admitted that he knowingly detained and arrested Plaintiff Mayel without any lawful authority to do so.

334.     Judge Somers, who throughout the criminal proceedings and trial demonstrated a strong bias in favor of the City police officers and in particular Defendant Kapanowski, would not permit Plaintiff Mayel to argue to the jury that her detention was unlawful, thus making any

subsequent order from Defendant Kapanowski unlawful.  Consequently, Plaintiff Mayel was unlawfully convicted of the "failure to obey" charge.  This conviction is on appeal.

335.    On September 24, 2010, a jury returned a unanimous verdict of not guilty on the "breach of peace" charges brought against Plaintiffs Qureshi, Wood, Rezkalla, and Mayel.

336.    Following the jury's acquittal of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, Defendant O'Reilly, speaking as Mayor and on behalf of the City, continued to misrepresent and criticize Plaintiffs' religious beliefs and to personally attack and defame Plaintiffs, falsely claiming that they are bigots and anti-Muslim.

337.    For example, following the jury's acquittal on September 24, 2010, Defendant O'Reilly told reporters in a published interview that Plaintiffs were pulling a publicity stunt on YouTube in order to raise money.  He was further quoted as stating, "It's really about a hatred of Muslims. . . .  that is what the whole heart of this is . . . .  Their idea is that there is no place for Muslims in America.  They fail to understand the Constitution."

338.    In a published news interview held in October 2010, Defendant O'Reilly said, "[A]ll of these claims [that sharia law is taking over in Dearborn] can be traced back to a group calling themselves the Acts 17 Apologetics.  They are the first people who started claims of sharia law in Dearborn.  In their own minds, they are experts on the Koran and the Bible, who think their interpretation is the correct one . . . they think Muslims should not be allowed to stay in the country unless they convert.  You want to talk about unconstitutional?  Nothing is less constitutional than that."

339.    Plaintiffs will attend future Arab Festivals in order to engage in their religious speech activities, which include discussing their Christian faith with Muslims, videotaping their discussions with Muslims, and handing out religious materials.  However, Defendants will

continue to impose their restrictions against Plaintiffs during these future festivals, subjecting Plaintiffs to arrest and false charges, thereby requiring injunctive relief to allow Plaintiffs to engage in their First Amendment activity free from unlawful government interference.

340.    Defendants' actions, policies, practices, customs, and/or procedures deprived Plaintiffs of their fundamental rights protected by the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution as set forth in this Complaint.

## FIRST CLAIM FOR RELIEF

### (Freedom of Speech and of the Press—First Amendment)

341.    Plaintiffs hereby incorporate by reference all stated paragraphs.

342.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, John Doe Police Officers 1 through 9, Beydoun, and Haidous have deprived Plaintiffs of their right to freedom of speech and of the press in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

343.    At the time of their arrests on June 18, 2010, Plaintiffs Qureshi, Wood, Rezkalla, and Mayel were participating in constitutionally protected activity.  Defendants' actions injured these Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity.   Plaintiffs' constitutionally protected activity motivated Defendants' adverse actions.  Thus, Defendants acted with a retaliatory intent or motive.

344.    At the time of their arrests on June 20, 2010, Plaintiffs Wood, Rezkalla, and Hogg were participating in constitutionally protected activity.   Defendants' actions injured these

Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity.  Plaintiffs' constitutionally protected activity motivated Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent or motive.

345.   By arresting Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for engaging in their free speech activity on June 18, 2010, Defendants violated the First Amendment.

346.   By arresting Plaintiffs Qureshi, Wood, Rezkalla, and Mayel on June 18, 2010, based on the listeners' reaction to Plaintiffs' speech, Defendants violated the First Amendment.

347.   By preventing Plaintiffs Qureshi, Wood, Rezkalla, and Mayel from engaging in their religious speech activity on June 18, 2010, Defendants violated the First Amendment.

348.   By seizing the video cameras and video footage of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel on June 18, 2010, and retaining control of these video cameras and the video footage for three weeks without lawful authority, Defendants deprived Plaintiffs of their right to freedom of speech and of the press in violation of the First Amendment.

349.   Defendants' Heckler's Veto Policy on its face and as applied against Plaintiffs Qureshi, Wood, Rezkalla, and Mayel as set forth in this Complaint violates the First Amendment.

350.   By favoring certain religious speech over Plaintiffs' religious speech, Defendants' restriction on Plaintiffs' speech was content and viewpoint based in violation of the First Amendment.

351.   Defendants targeted Plaintiffs' religious speech activities for disfavored treatment because Plaintiffs are Christians, they seek to convert Muslims to Christianity, and they are associated with Acts 17, in violation of the First Amendment.

352.     Defendants' Literature Distribution Restriction as set forth in this Complaint is selectively enforced against certain religious speech, including Plaintiffs' religious speech, and is thus content and viewpoint based in violation of the First Amendment.

353.     Defendants' Literature Distribution Restriction as set forth in this Complaint burdens substantially more speech than is necessary to further Defendants' interests, it is not narrowly tailored to serve a significant government interest, and it does not leave open ample channels of communication for Plaintiffs to meaningfully and effectively express their religious message in violation of the First Amendment.

354.     The enforcement of Defendants' Literature Distribution Restriction against Plaintiffs Wood, Rezkalla, and Hogg on June 20, 2010, deprived Plaintiffs of their right to freedom of speech and of the press in violation of the First Amendment.

355.     By seizing Plaintiffs Wood, Rezkalla, and Hogg and preventing them from distributing their religious literature on June 20, 2010, Defendants deprived Plaintiffs of their right to freedom of speech and of the press in violation of the First Amendment.

356.     Defendants' Arrest Policy as set forth in this Complaint violates the First Amendment.

357.     The enforcement of Defendants' Arrest Policy against Plaintiffs Wood, Rezkalla, and Hogg on June 20, 2010, deprived Plaintiffs of their right to freedom of speech and of the press in violation of the First Amendment.

358.     Defendants' Arrest Policy was the moving force behind the June 20, 2010, violation of Plaintiffs' right to freedom of speech and of the press protected by the First Amendment.

359.    Defendants' Free Speech Zone Policy as set forth in this Complaint lacks any objective standards or proper safeguards, is overbroad, and is selectively enforced, thereby operating to deprive Plaintiffs of their right to freedom of speech and of the press protected by the First Amendment.

360.    Defendants will seek to enforce their Literature Distribution Restriction against Plaintiffs at future Arab Festivals.

361.    Defendants will seek to enforce their Arrest Policy against Plaintiffs at future Arab Festivals.

362.    Defendants will seek to enforce their Free Speech Zone Policy against Plaintiffs at future Arab Festivals.

363.    Defendants' policy, practice, custom, and/or procedure of selectively prohibiting the use of video cameras at the Arab Festival violates the First Amendment's right to freedom of speech and of the press.

364.    Defendants' restriction on Plaintiff Mayel's use of her video camera on June 18, 2010, deprived Plaintiff Mayel of her right to freedom of speech and of the press in violation of the First Amendment.

365.    Defendants' seizure of Plaintiff Hogg's video camera and the erasure of his video footage on or about June 20, 2010, deprived Plaintiff Hogg of his right to freedom of speech and of the press in violation of the First Amendment.

366.    Defendants' requirement that Plaintiffs obtain their permission prior to engaging in their free speech activity at the Arab Festival—activity that includes discussing their religious beliefs with festival goers and recording those discussions on video—operates as an unconstitutional prior restraint on Plaintiffs' speech in violation of the First Amendment.

367.    As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

368.    Defendants Mrowka and Kapanowski acted with an evil motive or reckless or callous indifference to the federally protected rights of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, warranting punitive damages against these Defendants.

**SECOND CLAIM FOR RELIEF**

**(Freedom of Expressive Association—First Amendment)**

369.    Plaintiffs hereby incorporate by reference all stated paragraphs.

370.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, O'Reilly, Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, John Doe Police Officers 1 through 9, Beydoun, and Haidous have deprived Plaintiffs of their right to expressive association guaranteed by the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

371.    As set forth in this Complaint, Plaintiffs, as individuals, associate to further their personal religious beliefs.  Plaintiffs associate amongst themselves and with others in pursuit of a variety of religious ends.  Defendants' actions as set forth in this Complaint had the purpose and effect of preventing and deterring Plaintiffs' right to expressive association.

372.    Defendants targeted Plaintiffs for adverse and discriminatory treatment because Plaintiffs are associated with Acts 17.

373.    As a direct and proximate result of Defendants' violation of Plaintiffs' right to expressive association protected by the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

### THIRD CLAIM FOR RELIEF

### (Free Exercise of Religion—First Amendment)

374.    Plaintiffs hereby incorporate by reference all stated paragraphs.

375.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, O'Reilly, Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, John Doe Police Officers 1 through 9, Beydoun, and Haidous have deprived Plaintiffs of their right to religious exercise in violation of the Free Exercise Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

376.    Plaintiffs' expressive religious activity as set forth in this Complaint is protected by both the Free Speech Clause and the Free Exercise Clause of the First Amendment.

377.    Defendants targeted Plaintiffs for selective and disfavored treatment because of Plaintiffs' expressive religious activity in violation of the Free Exercise Clause of the First Amendment.

378.    By targeting Plaintiffs' religious speech activities for disfavored treatment because Plaintiffs are Christian who challenge Islam and seek to convert Muslims to Christianity and because Plaintiffs are associated with Acts 17, Defendants' actions violated the Free Exercise Clause of the First Amendment.

82

379.    Defendants' adverse actions against Plaintiffs were designed to persecute or oppress Plaintiffs' religion and Plaintiffs' religious practices, which Defendants disfavor, in violation of the Free Exercise Clause of the First Amendment.

380.    Defendants' Literature Distribution Restriction and its enforcement against Plaintiffs as set forth in this Complaint were designed to persecute or oppress Plaintiffs' religion and Plaintiffs' religious practices in violation of the Free Exercise Clause of the First Amendment.

381.    Defendants' Heckler's Veto Policy and its enforcement against Plaintiffs as set forth in this Complaint were designed to persecute or oppress Plaintiffs' religion and Plaintiffs' religious practices in violation of the Free Exercise Clause of the First Amendment.

382.    Defendants' Free Speech Zone Policy as set forth in this Complaint is selectively enforced and designed to persecute or oppress Plaintiffs' religion and Plaintiffs' religious practices in violation of the Free Exercise Clause of the First Amendment.

383.    As a direct and proximate result of Defendants' violation of the Free Exercise Clause of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## FOURTH CLAIM FOR RELIEF

### (Unlawful Search and Seizure—Fourth Amendment)

384.    Plaintiffs hereby incorporate by reference all stated paragraphs.

385.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, John Doe Police

Officers 1 through 9, Beydoun, and Haidous have deprived Plaintiffs of the right to be free from unreasonable searches and seizures protected by the Fourth Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

386.    By seizing Plaintiffs Qureshi, Wood, Rezkalla, and Mayel and their personal property and subjecting Plaintiffs to a search on June 18, 2010, without probable cause or any other lawful authority, Defendants violated Plaintiffs' rights protected by the Fourth Amendment.

387.    By seizing Plaintiffs Qureshi, Wood, Rezkalla, and Mayel and confining them in jail on June 18, 2010, and June 19, 2010, without probable cause or any other lawful authority, Defendants violated Plaintiffs' rights protected by the Fourth Amendment.

388.    By seizing Plaintiffs Wood, Rezkalla, and Hogg and their personal property and subjecting Plaintiffs to a search on June 20, 2010, without probable cause or any other lawful authority, Defendants violated Plaintiffs' rights protected by the Fourth Amendment.

389.    The enforcement of Defendants' Arrest Policy against Plaintiffs Wood, Rezkalla, and Hogg on June 20, 2010, violated Plaintiffs' rights protected by the Fourth Amendment.

390.    Defendants' Arrest Policy was the moving force behind the June 20, 2010, violation of Plaintiffs' rights protected by the Fourth Amendment.

391.    As a direct and proximate result of Defendants' violation of the Fourth Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, and they suffered physical and emotional harm, entitling them to declaratory and injunctive relief and damages.

392.    Defendants Mrowka and Kapanowski acted with an evil motive or reckless or callous indifference to the federally protected rights of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, warranting punitive damages against these Defendants.

## FIFTH CLAIM FOR RELIEF

### (Malicious Prosecution—Fourth Amendment)

393.    Plaintiffs hereby incorporate by reference all stated paragraphs.

394.    Defendants City, O'Reilly, Haddad, Mrowka, and Kapanowski initiated criminal proceedings and prosecutions against Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for "breach of peace."   A jury returned a unanimous verdict of not guilty in favor of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel for this criminal charge.   Defendants lacked probable cause for initiating these criminal proceedings and prosecution, and Defendants Mrowka and Kapanowski knowingly provided false evidence against Plaintiffs in their official police reports and at trial. Defendants' actions were undertaken with malice or a purpose in instituting the criminal charges other than bringing the alleged offenders to justice.

395.    As a direct and proximate result of Defendants' malicious prosecution of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory relief and damages.

396.    Defendants O'Reilly, Mrowka, and Kapanowski acted with an evil motive or reckless or callous indifference to the federally protected rights of Plaintiffs, warranting punitive damages against these Defendants.

## SIXTH CLAIM FOR RELIEF

### (Equal Protection—Fourteenth Amendment)

397.    Plaintiffs hereby incorporate by reference all stated paragraphs.

398.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, O'Reilly, Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Gafford, John Doe Police Officers 1 through 9, Beydoun, and Haidous have deprived Plaintiffs of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

399.    By granting use of a public forum to people whose religious views Defendants find acceptable, but denying use to those expressing less favored or more controversial religious views, such as those expressed by Plaintiffs, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

400.    Defendants' Literature Distribution Restriction, which was selectively enforced against Plaintiffs' religious activity and the religious activity of certain other Christians, violates the Equal Protection Clause of the Fourteenth Amendment.

401.    Defendants' Heckler's Veto Policy as applied against Plaintiffs' religious activity on June 18, 2010, violates the Equal Protection Clause of the Fourteenth Amendment.

402.    Defendants' Free Speech Zone Policy as set forth in this Complaint lacks any objective standards or proper safeguards, is overbroad, and is selectively enforced, thereby operating to deprive Plaintiffs of their right to the equal protection of the law guaranteed by the Fourteenth Amendment.

403.    Defendants' arrests of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel on June 18, 2010, violated the Equal Protection Clause of the Fourteenth Amendment by denying Plaintiffs access to a public forum to engage in their religious speech activities, which Defendants disfavor, while permitting others to use this forum for similar expressive activities, thereby denying the use of this forum to those whose expressive activities Defendants find unacceptable.

404.    Defendants' arrests of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel on June 18, 2010, violated the Equal Protection Clause of the Fourteenth Amendment because Defendants chose to arrest Plaintiffs due to invidious discrimination.  Defendants arrested Plaintiffs because they were exercising their fundamental constitutional rights to freedom of speech and of the press and the free exercise of religion protected by the First Amendment.  Additionally, Defendants singled out Plaintiffs for arrest because they are Christians associated with Acts 17.  Defendants did not arrest Muslims who were shouting profanities and making other disturbances at the 2010 Arab Festival.  Defendants' arrests of Plaintiffs have had a discriminatory effect on Plaintiffs and other similarly situated Christians.

405.    Defendants' arrests of Plaintiffs Wood, Rezkalla, and Hogg on June 20, 2010, violated the Equal Protection Clause of the Fourteenth Amendment because Defendants chose to arrest Plaintiffs due to invidious discrimination.  Defendants arrested Plaintiffs because they were exercising their fundamental constitutional rights to freedom of speech and of the press and the free exercise of religion protected by the First Amendment.  Additionally, Defendants singled out Plaintiffs for arrest because they are Christians associated with Acts 17.  By denying Plaintiffs access to a public forum to engage in their religious speech activities, which Defendants disfavor, while permitting others to use this forum for similar expressive activities,

thereby denying the use of this forum to those whose expressive activities Defendants find unacceptable, Defendants have deprived Plaintiffs of the equal protection of the law.

406.     Defendants' prosecution of Plaintiffs Qureshi, Wood, Rezkalla, and Mayel violated the Equal Protection Clause of the Fourteenth Amendment because Defendants chose to prosecute Plaintiffs due to invidious discrimination.  Defendants chose to prosecute Plaintiffs for allegedly violating the City's "breach of peace" ordinance because Plaintiffs were exercising their fundamental constitutional rights to freedom of speech and of the press and the free exercise of religion protected by the First Amendment.  Additionally, Defendants singled out Plaintiffs for prosecution because they are Christians associated with Acts 17.  Defendants did not arrest nor prosecute Muslims who were shouting profanities and making other disturbances at the 2010 Arab Festival, even though these Muslims were violating the City's "breach of peace" ordinance.  Defendants' efforts to prosecute Plaintiffs have had a discriminatory effect on Plaintiffs and other similarly situated Christians.

407.     Defendants chose to selectively enforce their laws, policies, practices, procedures, rules, regulations, restrictions, and/or customs against Plaintiffs during the 2010 Arab Festival as set forth in this Complaint out of an arbitrary desire to discriminate against Plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment.

408.     As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

409.     Defendants Mrowka and Kapanowski acted with an evil motive or reckless or callous indifference to the federally protected rights of Plaintiffs, warranting punitive damages against these Defendants.

## SEVENTH CLAIM FOR RELIEF

### (Vagueness—Fourteenth Amendment)

410.    Plaintiffs hereby incorporate by reference all stated paragraphs.

411.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, Haddad, Mrowka, Beydoun, and Haidous have deprived Plaintiffs of the due process of law guaranteed under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

412.    Defendants' Free Speech Zone Policy as set forth in this Complaint lacks any objective standards or proper safeguards, is overbroad, and is selectively enforced, thereby operating to deprive Plaintiffs of their right to due process of law protected by the Fourteenth Amendment.

413.    Defendants' Heckler's Veto Policy as set forth in this Complaint lacks any objective standards or proper safeguards, is overbroad, and is selectively enforced, thereby operating to deprive Plaintiffs of their right to due process of law protected by the Fourteenth Amendment.

414.    Defendants' Arrest Policy as set forth in this Complaint lacks any objective standards or proper safeguards, is overbroad, and is selectively enforced, thereby operating to deprive Plaintiffs of their right to due process of law protected by the Fourteenth Amendment.

415.    As a direct and proximate result of Defendants' violation of the Fourteenth Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## EIGHTH CLAIM FOR RELIEF

### (Defamation—First, Sixth, and Fourteenth Amendments and Michigan Law)

416.    Plaintiffs hereby incorporate by reference all stated paragraphs.

417.    By reason of the aforementioned false and defamatory statements that were made by Defendant O'Reilly and published by Defendants City and O'Reilly as set forth in this Complaint, Defendants have injured Plaintiffs' reputation and deprived Plaintiffs of their rights protected by the United States Constitution in violation of 42 U.S.C. § 1983.

418.    Defendants City and O'Reilly made and/or published the false and defamatory statements about Plaintiffs knowing that they were false or acting recklessly with regard to the falsity of the statements.

419.    Defendants City and O'Reilly made and/or published the false and defamatory statements about Plaintiffs knowing that they would injure Plaintiffs' reputation in that the statements are defamatory *per se*.

420.    Defendants City and O'Reilly made and/or published the false and defamatory statements about Plaintiffs with the intent to injure Plaintiffs' reputation.

421.    Defendants City and O'Reilly made and/or published the false and defamatory statements about Plaintiffs with actual and expressed malice and a reckless disregard for the truth.

422.    Defendants City and O'Reilly made and/or published the false and defamatory statements about Plaintiffs knowing that Plaintiffs' criminal trial was forthcoming and that the statements would be published on the City's official website and elsewhere and thus heard or read by thousands of persons, including potential and actual witnesses, jurors, and judges in

Plaintiffs' criminal trial, thereby attempting to deprive Plaintiffs of their rights to a fair trial and an impartial jury guaranteed by the Sixth and Fourteenth Amendments.

423.    Defendants City's and O'Reilly's false and defamatory statements were not privileged in that they were not made in the context of any judicial proceedings or in any other criminal or administrative proceedings.

424.    Defendants City's and O'Reilly's false and defamatory statements caused injury to Plaintiffs' reputation that was coupled with an attempt to deprive Plaintiffs of their fundamental constitutional right to a fair and impartial trial.

425.    Defendants City's and O'Reilly's false and defamatory statements were made in connection with Plaintiffs' unconstitutional arrests and the violation of Plaintiffs' rights protected by the First and Fourth Amendments.

426.    As a direct and proximate result of Defendants City's and O'Reilly's false and defamatory statements, including those statements that were and continue to be published by the City, Plaintiffs have suffered irreparable harm to their reputation and a loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## NINTH CLAIM FOR RELIEF

### (Establishment Clause—First Amendment)

427.    Plaintiffs hereby incorporate by reference all stated paragraphs.

428.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City and O'Reilly violated the Establishment Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

429.    By officially favoring and endorsing certain religious organizations, beliefs, and practices and disfavoring Plaintiffs and their religious beliefs and practices, Defendants City and O'Reilly violated the Establishment Clause.

430.    Defendants' official endorsement of certain religious organizations, beliefs, and practices and official condemnation of Plaintiffs and their religious beliefs and practices lack a secular purpose, have the primary effect of advancing certain religions and religious beliefs and inhibiting Plaintiffs' religion and religious beliefs, and create excessive entanglement with religion in violation of the Establishment Clause.

431.    Defendants' official endorsement of certain religious organizations, beliefs, and practices and official condemnation of Plaintiffs and their religious beliefs and practices convey an impermissible, government-sponsored message of approval of certain religious organizations, beliefs, and practices and disapproval of and hostility toward Plaintiffs and their religious beliefs and practices.  As a result, Defendants' actions send a clear message to Plaintiffs and others who associate with them for religious purposes that they are outsiders, not full members of the political community and an accompanying message that those who oppose Plaintiffs and their religious beliefs and practices are insiders, favored members of the political community, in violation of the Establishment Clause.

432.    As a direct and proximate result of Defendants' violation of the Establishment Clause, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## TENTH CLAIM FOR RELIEF

### (Conspiracy to Violate Constitutional Rights—42 U.S.C. § 1983)

433.    Plaintiffs hereby incorporate by reference all stated paragraphs.

434.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants City, O'Reilly, Haddad, Mrowka, Kapanowski, Smith, Ballard, Micallef, Matteocci, Fawaz, Beydoun, and Haidous, along with co-conspirators Williams, Alslami, and other festival workers, volunteers, and/or security personnel, acted jointly and conspired to violate Plaintiffs' rights protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

435.    Defendants conspired to prevent Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel from engaging in their religious speech activity on June 18, 2010, at the 2010 Arab Festival.

436.    Defendants conspired to punish Plaintiffs Acts 17, Qureshi, Wood, Rezkalla, and Mayel for engaging in their religious speech activity on June 18, 2010, at the 2010 Arab Festival.

437.    Defendants conspired to have Plaintiffs Qureshi, Wood, Rezkalla, and Mayel arrested and jailed for engaging in their religious speech activity on June 18, 2010, at the 2010 Arab Festival.

438.    Defendants conspired to punish Plaintiffs Acts 17, Qureshi, and Wood for publishing their 2009 YouTube videos as set forth in this Complaint.

439.    As a direct and proximate result of Defendants' conspiracy to violate Plaintiffs' fundamental constitutional rights, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and damages.

### ELEVENTH CLAIM FOR RELIEF

### (Assault and Battery)

440.    Plaintiffs hereby incorporate by reference all stated paragraphs.

441.    By reason of the aforementioned acts of forcefully grabbing Plaintiff Mayel's arm and forcefully grabbing the video camera she was holding, acts which were done without lawful authority, Defendant Kapanowski committed an assault and battery against Plaintiff Mayel.

442.    As a direct and proximate result of Defendant Kapanowski's assault and battery, Plaintiff Mayel suffered physical and emotional harm, entitling her to damages.

443.    Defendant Kapanowski's conduct was wanton and reckless, entitling Plaintiff Mayel to punitive damages.

444.    By reason of the aforementioned acts of forcefully grabbing Plaintiff Wood's arm and the video camera he was holding, acts which were done without lawful authority, Defendant Gafford committed an assault and battery against Plaintiff Wood.

445.    As a direct and proximate result of Defendant Gafford's assault and battery, Plaintiff Wood suffered harm, entitling him to damages.

## TWELFTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

446.    Plaintiffs hereby incorporate by reference all stated paragraphs.

447.    By reason of the aforementioned acts of forcefully grabbing Plaintiff Mayel's arm and forcefully grabbing the video camera she was holding, acts which were done without lawful authority, by detaining her in the police command trailer against her will, by placing her in handcuffs, by sending her to jai, and by admitting that he was intentionally causing her "pain and suff[erring]," knowing that she was already emotionally upset for having been unlawfully arrested and detained in the police command trailer, Defendant Kapanowski intentionally and recklessly engaged in extreme and outrageous conduct that caused Plaintiff Mayel severe emotional distress, entitling her to damages.

94

448.    Defendant Kapanowski's conduct was wanton and reckless, entitling Plaintiff Mayel to punitive damages.

449.    By reason of the aforementioned acts of dangling the handcuffs in front of Plaintiff Mayel while informing her that she was going to be placed in the handcuffs and sent to jail, knowing that she was already emotionally upset for having been unlawfully arrested and detained in the police command trailer, and then ordering her to be handcuffed and sent to jail, Defendant Mrowka intentionally and recklessly engaged in extreme and outrageous conduct that caused Plaintiff Mayel severe emotional distress, entitling her to damages.

450.    Defendant Mrowka's conduct was wanton and reckless, entitling Plaintiff Mayel to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this court:

A)      to declare that Defendants violated Plaintiffs' fundamental constitutional rights as set forth in this Complaint;

B)      to permanently enjoin Defendants' Heckler's Veto Policy and its application to Plaintiffs' speech and related activities as set forth in this Complaint;

C)      to permanently enjoin Defendants' Literature Distribution Restriction and its application to Plaintiffs' speech and related activities as set forth in this Complaint;

D)      alternatively, to permanently enjoin Defendants' Literature Distribution Restriction and its application to Plaintiffs' speech and related activities in the outer perimeter as set forth in this Complaint;

E)      to permanently enjoin Defendants' Arrest Policy and its application to Plaintiffs' speech and related activities as set forth in this Complaint;

F)      to permanently enjoin Defendants' Free Speech Zone Policy and its application to Plaintiffs' speech and related activities as set forth in this Complaint;

G)      to award Plaintiffs nominal and compensatory damages against all Defendants;

H)      to award Plaintiffs punitive damages against certain Defendants in their individual capacities as set forth in this Complaint;

I)      to award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

J)      to grant such other and further relief as this court should find just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues triable of right by a jury.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.

*Counsel for Plaintiffs*